## Harris v. City of Louisville.

Appeal from Jefferson Circuit Court
(Criminal Division).

## Buchanan v. Warley.

(Decided June 18, 1915.)

Appeal from Jefferson Circuit Court
(Chancery Branch, No. 1).

1.  Constitutional Law—The Police Power—Control of Use of Private Property.—All private property is held subject to the unchallenged right and power of government to impose upon the use and enjoyment thereof such reasonable restraints as are deemed expedient for the public welfare.

2.  Constitutional Law—Due Process—Partial Restraint Upon Opportunity for Alienation of Private Property.—An indirect restraint upon the right of alienation, resulting from the denial of the probability of alienation to certain classes of purchasers, cannot be held to be a destruction of the power to alienate, or deprivation of a vested right, violative of the due process clause of the fourteenth amendment to the Federal Constitution.

3.  Constitutional Law—Guaranties of Civil and Personal Rights.—The constitutional guaranties are not absolute guaranties; but are subordinate to the paramount right of government to impose reasonable restraints when the public welfare renders such legislation expedient.

4. Constitutional Law—Municipal Segregation Ordinance.—The municipal segregation ordinance enacted by the municipal legislature and herein copied in full is a proper and valid exercise of the police power and a reasonable and expedient measure for the public welfare, directed to the prevention of outbreaks of violence resulting from racial antipathies, and to the preservation of racial solidarity.

LOGAN N. ROCK and W. H. WRIGHT for appellant.

BLAKEY, QUIN & LEWIS for appellant, Buchanan.

STUART CHEVALIER and PENDLETON BECKLEY for appellees, City of Louisville and Warley.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

These two appeals involve a common question—the validity of the following ordinance enacted by the council of the city of Louisville:

"An ordinance to prevent conflict and ill-feeling between the white and colored races in the city of Louisville, and to preserve the public peace and promote the general welfare, by making reasonable provisions requiring, as far as practicable, the use of separate blocks for residences, places of abode and places of assembly by white and colored people respectively.

"Be it ordained by the General Council of the City of Louisville:

"Section 1. It shall be unlawful for any colored person to move into and occupy as a residence, place of abode, or to establish and maintain as a place of public assembly, any house upon any block upon which a greater number of houses are occupied as residences, places of abode, or places of public assembly by white people than are occupied as residences, places of abode, or places of public assembly by colored people.

"Section 2. It shall be unlawful for any white person to move into and occupy as a residence, place of abode, or to establish and maintain as a place of public assembly, any house upon any block upon which a greater number of houses are occupied as residences, places of abode, or places of public assembly by colored people than are occupied as residences, places of abode or places of public assembly by white people.

"Section 3. The word 'block' as the same is used in this ordinance shall be construed to mean that portion of any street or public alley upon both sides of the

same between two adjacent intersecting or crossing streets or public alleys, or between such streets or alleys, if extended. In determining the boundary of any given block for the purpose of complying with the provisions of this ordinance, there shall be taken as a basis of measuring the length of such block, the space between the intersecting streets or public alleys on that side of the street or alley on which the house numbers are even, if that side of the street be divided into blocks; otherwise, the block on the opposite side shall be taken as the basis. A 'residence' or 'place of abode' or 'place of public assembly' shall be counted in that block on which it faces and has its main entrance.

"Section 4. Nothing in this ordinance shall affect the location of residences, places of abode or places of public assembly made previous to the approval of this ordinance, and nothing herein shall be so construed as to prevent the occupation of residences, places of abode or places of public assembly, by white or colored servants or employes of occupants of such residences, places of abode or places of public assembly on the block on which they are so employed; nor shall anything herein contained be construed to prevent any person who, at the date of the passage of this ordinance, shall have acquired or possessed the right to occupy any building as a residence, place of abode or place of assembly, from exercising such a right. Nor shall anything herein contained prevent the owner of any building now leased, rented or occupied as a residence, place of abode or place of public assembly for colored persons, from continuing to rent, lease or occupy such residence, place of abode or place of public assembly for such persons, if the owner shall so desire; but, if such house should, after the passage of this act, be at any time leased, rented or occupied as a residence, place of abode or place of assembly for white persons, it shall not thereafter be used for colored persons, if such occupation would then be a violation of Section One hereof. Nor shall anything herein contained prevent the owner of any building now leased, rented or occupied as a residence, place of abode or place of assembly for white persons, from continuing to rent, lease or occupy such residence, place of abode or place of assembly for such purpose, if the owner shall so desire; but if such house should, after the passage of this act, be at any time leased, rented or occupied as a

residence, place of abode or place of assembly for colored persons, it shall not thereafter be so used for white persons, if such occupation would then be a violation of Section Two hereof.

"Section 5. Any person intending to build or erect for himself, or as agent for another, any building to be used as a residence, place of abode or place of public assembly, upon property situated on a block on which there are no buildings used as a residence, place of abode or place of public assembly, shall, in the application for a permit to the Building Inspector, declare for what purpose said proposed building for which the permit is asked is to be used, whether as a residence or place of abode or place of public assembly for white persons or for colored persons. Upon the filing of said application, the Building Inspector shall, as soon as practicable thereafter, cause to be published twice a week for two successive weeks in one German and in one English daily paper of the city of Louisville, and at the cost of said applicant, the fact that a building of the character described is proposed to be built at the place indicated in the permit and to be used or occupied as a residence, place of abode or place of public assembly, as the case may be, for white or colored people; and he shall cause to be posted at some convenient place on or near the lot where such building is proposed to be erected a similar statement; and unless within five days after the date of the last publication thereof, protest be made in writing to the Building Inspector by those owning more than fifty per cent. of the foot frontage of said block against the use mentioned in said application, the permit desired shall, if in other respects said application be in conformity with the ordinances of the city, be granted. Thereafter, all buildings erected for residences, places of abode or places of public assembly on said block, and all buildings erected on said block for other purposes, but which it may be desired thereafter to use as residences, places of abode or places of public assembly, shall be so used either for white persons or for colored persons respectively, as may be determined by the permit granted in the manner hereinabove provided. If, however, the owners of more than fifty per cent. of the foot frontage on said block in which the proposed building is to be erected and for which a permit is asked, shall protest against such building in the manner above provided,

then in such case no permit shall be issued on said application for the erection of a building for the use set out therein. Whenever a protest is filed under the provisions of this ordinance, those signing the protest shall state the exact number of feet of their respective property that front on the block in question, and each signature to such protest shall be acknowledged before a notary public; and any signature not so acknowledged shall be disregarded by the Building Inspector.

"The provisions of this ordinance are intended to provide a method by which a block which is vacant may be improved and by which its use for either white persons or colored persons may be determined, but shall not be construed to abridge unlawfully any constitutional right which any owner of property may possess to use or occupy his property, subject to reasonable police regulations.

"Section 6. No person shall be granted a permit by the Building Inspector for the construction of any house or other building intended to be used as a residence, as a place of abode, or as a place of public assembly, unless he state in his application for a permit whether the house or building to be constructed is designed to be occupied or used by white or colored people; and if upon the completion of said building, or any time thereafter, the owner shall permit said building to be occupied in any manner other than as stated in said application, he shall at once file with the Building Inspector an affidavit stating the change in the manner of use or occupancy. Whenever the use or occupancy of any building as a residence, place of abode or place of assembly for white or colored people, whether erected before or after the passage of this ordinance, is changed from white to colored, or from colored to white, after the passage of this ordinance, the owner of said building shall at once file with the Building Inspector a sworn statement of such change. If the owner of any building used or occupied as a residence, place of abode or place of assembly, shall permit its use or occupation before there is a compliance with the provisions of this section, he shall be fined for each day of such use or occupation, not less than five dollars nor more than fifty dollars. But no permit issued by the Building Inspector shall authorize any person to use or occupy any property in violation of any section of this ordinance.

"Section 7. It shall be the duty of the Building Inspector, as soon as practicable after the passage of this ordinance, to prepare and preserve for inspection in his office, maps of such blocks in the city of Louisville as are now occupied as residences, places of abode and places of assembly for both white and colored people, and shall continue to make such maps from time to time as will enable his office and the public to determine the character of use or occupancy of any given block in the city. Such map so prepared and properly certified shall be *prima facie* evidence of the facts shown thereby. Any owner of property in the city of Louisville, or any agent therefor, or any occupant thereof, who shall refuse, upon request, to furnish to the Building Inspector, or any one whom he may appoint to gather such information, with such information as such owner, agent or occupant may possess, necessary to make up such map and to revise it from time to time, or who shall furnish any knowingly false information as to the character of use or occupancy of any residence, place of abode or place of assembly in the city of Louisville, shall be subject to a fine of not less than five dollars nor more than fifty dollars for each offense. But the failure of the Building Inspector to comply with the provisions of this section shall not operate to exempt or excuse any person from complying with the terms of this ordinance.

"Section 8. Any person who shall violate this ordinance either by himself or through his agent, or any agent for another violating any provision of this ordinance for which a penalty is not otherwise provided, shall be liable to a fine of not less than five dollars nor more than fifty dollars for each offense. Each day that property is occupied in violation of this ordinance shall constitute a separate offense for the purposes of this section.

"Section 9. The invalidity of any portion of this ordinance shall not affect the validity of any other portion thereof which can be given effect without such invalid part.

Section 10. This ordinance shall take effect from and after its passage." (Approved May 11, 1914.)

We may say at the outset that the cases here presented involve only the first four sections of the ordinance.

Upon behalf of the appellants who are attacking the ordinance it is contended that it is not a valid exercise of the police power.

The effort to relieve the situation caused by the close association of the races under the congested conditions found in modern municipalities, has resulted in the legislation here involved. "Municipal Segregation Ordinances," as they are termed, have been enacted in and passed upon by the appellate courts of but three States so far as we have been able to learn; and these we shall consider in their order.

A municipal segregation ordinance was enacted by the city council of Baltimore, and passed upon by the Maryland Court of Appeals, in State v. Curry, 88 Atl., 546, 47 L. R. A. (N. S.), 1087.

Unlike the Louisville ordinance here involved, the Baltimore ordinance did not undertake to legislate on what were "mixed blocks"—those occupied by members of the two races—but simply prohibited a white person from moving into a block inhabited solely by colored persons and prohibited colored persons from moving into a block inhabited solely by whites.

And, unlike the ordinance here involved, it contained no reservation in protection of vested rights, existing at the time of the enactment of the ordinance. The effect of that ordinance is shown in the following excerpt from the opinion:

"If the traverser (a colored man), for example, on May 15, 1911, when the ordinance was passed, owned a dwelling in what was made a white block, he could not, under the ordinance, move into it, although it was perfectly lawful for him to own it when he became the owner, and to use it as a dwelling. He might be unable to rent it to a white person, and as a colored person was prohibited from moving into it, he could not rent it to a colored person; and he could not under the ordinance move into it himself. The result would be that the house would remain idle unless he could sell it, which, under the circumstances, would likely be at a great sacrifice, although when he acquired it he had the right under the Constitution and laws of Maryland to occupy it as a dwelling, or to rent it to any person, white or colored, for legitimate purposes."

The Louisville ordinance is not subject to this criticism, for in Section 4 it is provided that nothing "herein

contained shall be construed to prevent any person who at the date of the passage of this ordinance, shall have acquired or possessed the right to occupy any building as a residence, place of abode or place of assembly, from exercising such right."

Another criticism of the Baltimore ordinance by the Maryland court is as follows: "Or, it might be that a white person had a valuable and attractive house in a block which was otherwise occupied by colored people. Yet, if at the date of the passage of the ordinance, it happened to be unoccupied as a dwelling, he could not, under the ordinance, move into it or rent it to a white person. To deny him such right would be a practical confiscation of his property, for his house might be of such a character he could not rent it to a colored person, and if he could not use it himself, he would be deprived of not only the income from it, but of such use of it as is guaranteed to every owner of property by the Constitution and laws of the land. Of course, the same conditions might exist when the owner of one house was colored and the other residents of the block white, although probably not so likely to happen."

But, as heretofore seen, these criticisms are all provided against in the Louisville ordinance here under consideration.

Upon a consideration of the ordinance enacted in Baltimore, the Maryland court, without committing itself upon the question of whether it would be possible for the legislature of the State to take away such vested rights, held that the attempted exercise of the police power was of such character as to preclude the court from assuming that the legislature intended to confer on the municipality the power to affect vested rights in the manner sought by the ordinance.

The municipal legislature of the city of Winston, North Carolina, adopted a municipal segregation ordinance, which was passed upon by the Supreme Court of North Carolina, in the case of State v. Darnell, 81 S. E., 338, 51 L. R. A. (N. S.), 332. The ordinance is not copied in the opinion, but it is apparent that it, like the Baltimore ordinance, contains no saving provision in protection of vested rights existing at the time of the adoption of the ordinance.

The opinion is notable in that the court seems to have been impressed by the time-worn sophistry (always ad-

vanced when legislation of this character is being attacked), that if the power exist to segregate whites and blacks, then the power must likewise exist to segregate Republican and Democrat, persons of Irish descent and those of German descent, Protestant and Catholic, and so on. This argument was advanced and answered by this court in the Berea College case (123 Ky., 209), and conclusively disposed of by the Supreme Court of the United States in Plessy v. Ferguson, 163 U. S., 537. To give ear to this kind of reasoning is to close one's mind to the gravity of the race problem as it exists in our country today, and especially to those phases of it most intimately concerned with congested municipal conditions.

The opinion is also notable in that the court for the time being apparently forgetful that congested municipal conditions and rural conditions are not identical, seems impressed with the argument that if segregation may be enforced in a city, it may be enforced in rural communities as well.

But after a consideration of the matter, the court said that "Whether if the general assembly had passed a statute conferring on town or county commissioners the authority to make such an ordinance as this, it would have been constitutional, is not now before us. We simply hold that an act of this broad scope, so entirely without precedent in the public policy of the State and so revolutionary in its nature, cannot be deemed to have been within the purview of the legislature from the use of the words 'conferring authority to make ordinances for the general welfare.' "

The municipal legislature of Atlanta enacted a segregation ordinance which was passed upon by the Supreme Court of Georgia on February 12, 1915, in the case of Carey v. City of Atlanta, 84 S. E., 456.

The ordinance there involved, like the Baltimore ordinance above mentioned, failed to contain any saving clause in protection of vested rights acquired before the passage of the ordinance. The court had before it the two opinions above mentioned, and interpreted the Maryland opinion as recognizing that *jus disponendi* (right of disposal) is a right within the protection of the Constitution, and denied by the ordinance, although indicating a disposition to hold the ordinance void because it ignored vested rights existing at the time of its passage.

There is also quoted from the North Carolina case the following language: "Besides an ordinance of this kind forbids the owner of property to sell or to lease it to whomsoever he sees fit, as well as forbids those who may be desirous of buying or renting property, from doing so where they can make the best bargain. Yet this right of disposing of property, the *jus disponendi*, has always been held one of the inalienable rights incident to the ownership of property, which no statute will be construed as having the power to take away."

The Georgia court then adopts as its theory for denying the validity of the ordinance its operation in denying to the owner the right to use, control or dispose of his property; the court holding that the ordinance destroys the right of the individual to acquire, enjoy and dispose of his property, and that it was therefore void as being in contravention of the Due Process Clause of the Federal Constitution.

However, Lumpkin, J., in an able "specially-concurring" opinion, said: "It seems to me that the discussion in regard to the right to use property as an incident to ownership may lead to extreme results. The right of an owner to use his property is important, but it is not so absolute that he may at all times and under all circumstances use it as he pleases, regardless of the public welfare, morals or safety. The statute books contain many laws restricting the use of property by the owner of it, and prohibiting him from using it for certain purposes." After further discussion of the matter, Judge Lumpkin said: "Suppose that an owner of property in the best residential portion of a city should claim the right to build upon his lot a large boarding-house or rooming-house in which he should receive indifferently boarders of both races and sexes, producing a situation of great irritation and calculated to bring about unfortunate results. It is quite possible that the sacred right of property might be subject to regulation for the public safety (which has been declared to be the supreme law) by a reasonable *pre-existing* ordinance." The writer of the concurring opinion then joins in holding the ordinance unconstitutional, but upon the ground that the ordinance delegated to individuals the right to say how property might be occupied, a point not involved upon the appeal here under consideration.

Judge Lumpkin, in closing his concurring opinion, said that while he agreed with the majority of the court in declaring the ordinance unconstitutional, he thought the line of reasoning adopted by them may carry them too far; and in this statement we are heartily disposed to join him.

The *jus disponendi* has but little place in modern jurisprudence. The advance of civilization and the consequent extension of governmental activities along lines having their objective in better living conditions, saner social conditions, and a higher standard of human character has resulted in a gradual lessening of the dominion of the individual over private property and a corresponding strengthening of the regulative power of the State in respect thereof, so that today all private property is held subject to the unchallenged right and power of the State to impose upon the use and enjoyment thereof such reasonable regulations as are deemed expedient for the public welfare.

There is nothing in the ordinance here under consideration which takes away from any person the right to acquire property anywhere in the city; but the ordinance does prohibit the occupancy of property under certain circumstances, by an owner who acquires same after the adoption of the ordinance; and such restraint upon the use of property acquired with notice of a regulatory ordinance is valid as a competent declaration of the municipal legislature.

If it be conceded that the right of alienation is a vested right which cannot be taken away altogether by legislation, still such is not the effect of the ordinance. An indirect restriction upon the right of alienation, resulting from the denial of the probability of alienation to certain classes of purchasers, cannot be held to be a complete destruction of the power to alienate or deprivation of a vested right, violative of the constitutional guaranties. So much for the *jus disponendi*.

Appellants claim the protection of the constitutional guaranties preserved in Sections 1, 2 and 26 of the Bill of Rights included in the Constitution of Kentucky, in Article 1, Section 10, Sub-section 1 of the Constitution of the United States, and in the Fourteenth Amendment thereto; and assert that the ordinance under consideration is violative thereof.

But the principle above stated is so well settled that no extended discussion is necessary to establish that reasonable restraints upon the use of private property and upon the liberty to contract, are not subversive of the constitutional limitations mentioned, and that such restraints do not constitute a deprivation of "life, liberty or property without due process of law" within the meaning and purview of the Fourteenth Amendment.

These constitutional guaranties are not absolute guaranties, but are subordinate to the paramount right of government to impose reasonable restraints thereupon when the public welfare renders such legislation expedient. Crowley v. Stephensen, 137 U. S., 86; Mugler v. Kansas, 123 U. S., 623.

But, it is contended that the ordinance is violative of the Fourteenth Amendment because it will prevent the residence of negroes in the more desirable portions of the city.

If such should chance to be its practical effect (though there is nothing in the ordinance itself which warrants the conclusion), we do not understand how this could be construed to be a denial of the equal protection of the law. The enforced separation of the races alone is not a discrimination or denial of the constitutional guaranty; and if such separation should result in the members of the colored race being restricted to residence in the less desirable portions of the city, they may render those portions more desirable through their own efforts, as the white race has done. Economic equality is not created by statutory declaration nor guaranteed by the Fourteenth Amendment.

Nor are we disposed to concede that the ordinance here involved transcends the authority of the municipal legislature, or to doubt that it constitutes a valid exercise of the police power and a reasonable and expedient measure for the public welfare.

The public policy of this State in respect of the separation of the races has long been exhibited in legislation. By legislative mandate, the races have been separated upon public conveyances where by virtue of necessity they must otherwise have been associated; by legislative mandate, they have been separated in the public schools; and, notwithstanding the fact that attendance upon private schools is purely a matter of individual volition, by legislative mandate, the races have

been separated therein; and the use of private property for the maintenance of a school wherein students of both races are taught together, is, by legislative mandate, prohibited. See Berea College v. Commonwealth, 123 Ky., 209 (affirmed in 211 U. S., 45).

In view of the fact that this legislation is upheld partly in recognition of the peril to race integrity induced by mere propinquity, we see but little difference in the prevention by law of the association of white and colored pupils in the schools of the State and in the prevention of their living side by side in their homes. It is said by appellant that "in a man's house no such association and contact is necessary" as in the schools or on public conveyances. But the court will not close its eyes to the fact that under the congested conditions of modern municipal life, there is practically as much, if not a greater degree of association among the children of white and colored inhabitants when living side by side than there would be in mixed schools under the direct observation of teachers.

In the Berea College case this court, in its opinion, written by Judge O'Rear, said: "If, then, it is a legitimate exercise of the police power of government to prevent the mixing of the races in cross-breeding, it would seem to be equally within the same power to regulate that character of association which tends to a breach of the main desideratum—the purity of racial blood. * * * A separation of the races under certain conditions is, therefore, enforced where it is believed that their mingling would tend to produce the very conditions which it is found lie at the base of the trouble. In its application, it becomes all the more necessary that the overmastering principles included in the police power of the government be firmly recognized, so that a clashing of race prejudice, or race destruction may be lawfully averted." And, citing from West Chester R. Co. v. Miles, 55 Pa. St., 209, 93 A. D., 747, it was further said:

"The tendency of intimate social intermixture is to amalgamation, contrary to the law of the races. The separation of the white and black races upon the surface of the globe is a fact equally apparent. Why this is so, it is not necessary to speculate; but the fact of a distribution of men by race and color is as divisible in the providential arrangement of the earth as that of heat

and cold. The natural separation of the races is, there-fore, an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature. From social amalgamation is but a step to illicit intercourse, and but another to intermarriage. But to assert separateness is not to declare inferiority in either; it is not to declare one a slave and the other a freeman—that would be to draw the illogical sequence of inferiority from difference only. It is simply to say that, following the order of Divine Providence, human authority ought not to compel these separate races to intermix. The right of such to be free from social con-tact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations, so far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races es-tablished by the Creator himself and not to compel them to intermix contrary to their instincts.''

The subject is so fully and ably discussed in the opinion in the Berea College case that it needs no ex-tended argument at this time to demonstrate that this State is fully committed to the principle of the separa-tion of the races whenever and wherever practicable and expedient for the public welfare; not to segregation as a measure imposing stigma, for none is thereby im-posed, but in order to prevent such conflicts as are shown by this record to have resulted in Louisville from the racial discord consequent upon the close association of the races; and in order that the solidarity of the races may be preserved; and, finally, that in a spirit of mu-tual helpfulness and racial friendship, each race may attain those heights of human development which are its to be won, and may aid in bringing to this State and Nation of ours all that the undreamed future has in store for us.

Much has been done in the years gone by, much is being done today by the white people of the Nation for the uplift of the colored race. But those who have studied the future of the race (and, in fact, its leading member in the country today); declare that he must ultimately rise largely through the co-operation, the

earnest efforts and the loyal service of his own more fortunate and more enlightened brothers.

For those of the race who are doing their full duty in this respect, municipal segregation will simplify the problem; and, if there be those more fortunate members of the race who in the day of their good fortune would abandon their less fortunate fellows and be false to the duties and responsibilities laid upon them by virtue of their own success, municipal segregation will indirectly enforce their acceptance of those responsibilities and coerce their performance of the duties thereby imposed; and thus, in the end, it will justify that enlightened civic spirit by which it is demanded.

The first four sections of the ordinance are valid. The judgments are affirmed; the whole court sitting.