## Fowler v. Obier, City Building Inspector, et al.

(Decided May 29, 1928.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Second Division).

1. Municipal Corporations.—Municipal zoning ordinances are enacted under what is commonly called the police power.
2. Constitutional Law.—The people of every state have the inherent right to pass laws for the public safety, health, morals, and general welfare.
3. Constitutional Law.—The police power of a state rests in the Legislature of such state, and no subdivisions thereof may exercise that power except throught grant made by the people of the state through its legislative branch.
4. Constitutional Law.—Generally speaking, courts uphold regulatory measures enacted under the police power if they are related to health, safety, morals, and general welfare of community; but if courts find that such measures are not related in some way to health, safety, morals, and general welfare, measures will be declared invalid as unconstitutional exercise of power by the legislative branch of government.
5. Municipal Corporations.—A city cannot exercise police power in enacting a zoning ordinance unless right to exercise such power has been given by the state Legislature.
6. Municipal Corporations.—The city of Louisville has power, under Ky. Stats., secs. 2742, 2783, regardless of the City Planning and Zoning Act 1922 (Acts 1922, c. 99), and Acts 1924, c. 87, repealing such Planning and Zoning Act, to regulate by zoning ordinance the use of property within the city for the purposes of business, trade and industry.

7. Municipal Corporations.—Where Legislature has delegated to the municipality the right to exercise police power in the enactment of zoning ordinances, before such ordinances can be declared un-constitutional as excessive use by city of delegated power, it must be shown that provisions contained in them are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

8. Constitutional Law.—Though the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly arising.

9. Courts.—The Court of Appeals is not bound to follow the opinion of the United States Supreme Court in defining the extent of the police power.

10. Municipal Corporations.—City of Louisville could enact an emergency ordinance establishing temporary building restrictions pending investigation for the enactment of a general zoning law.

11. Evidence.—Court of Appeals will judicially notice that it will take a city some time to work out details of a general zoning plan, so that a temporary restrictive ordinance may be required and be proper.

12. Municipal Corporations.—Temporary ordinance of city relative to restrictions on persons' use of their property pending city's investigation for, and enactment of, a zoning ordinance, held not invalid as suspending for two years the building laws of the city in violation of Constitution, Bill of Rights, sec. 15.

13 Constitutional Law.—Emergency ordinance relative to building restrictions pending the city's investigation for and enactment of a permanent zoning ordinance held not invalid as depriving citizens of property without due process of law.

14. Municipal Corporations.—Emergency ordinance, relative to building restrictions to be enforced pending city's investigation for and enactment of a permanent zoning ordinance, held not invalid as unreasonable or arbitrary exercise of power over citizen's property rights.

15. Municipal Corporations.—In passing upon the validity of a temporary ordinance relative to city's building regulations, such ordinance to be enforced pending investigation for and enactment of a permanent zoning ordinance, and attacked as unreasonable and arbitrary, Court of Appeals would not scrutinize temporary ordinance with same degree of care that it would if it had been enacted as a permanent ordinance.

16. Municipal Corporations.—In city zoning ordinance defining residence zone as meaning land fronting on both sides of any public street or court where less than 25 per cent. of the frontage was then used or designed for business or industrial purposes, there must be some overt act or some setting apart of the land for a business or industrial purpose before it can be said to have been "designed" for that purpose.

17. Municipal Corporations.—Action of board of public safety, on appeal from city building inspector's refusal to issue a building permit, held not so arbitrary as to cause the order of the board affirming such refusal be set aside by reviewing court.

18. Municipal Corporations.—A court should not set aside the determination of public officers relative to exercise of power under enactments pursuant to police power rules, unless it is clear that their action is without any reasonable foundation and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, morals, safety, or public welfare in its proper sense.

19. Municipal Corporations.—Abuse of discretion in board of public safety's determining whether building permit should be granted held not shown.

J. L. RICHARDSON for appellant.

W. T. BASKETT and WM. G. DEARING for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

The appellant, J. W. Fowler, in his petition filed in the lower court alleged that he was the owner in fee simple of a certain lot in the city of Louisville which is described, and the description shows that it fronts 50 feet on Third street, and 200 feet on Woodlawn avenue. There are two buildings on the lot, a residence fronting on Third street, and a business house fronting on Woodlawn avenue. Appellant alleged in his petition that he had entered into a contract for the sale of a part of his lot, that is, 100 feet fronting on Woodlawn avenue, and that the sale was made for the purpose of having erected thereon a gas and oil service station which was to be constructed strictly in accordance with the requirements of the building code. After having entered into the contract for the sale of a portion of the lot, appellant alleged that he made an application to the building inspector of the city of Louisville, the appellee, J. Lynn Obier, in the manner and form required by the ordinances of the city at the time. But the building inspector refused his application and denied him a permit on the ground that the granting of the permit would be in violation of the zoning ordinances. Feeling aggrieved by the decision of the building inspector, appellant alleged that he appealed to the board of public safety, and, upon a hearing before that board, his appeal was denied and the building inspector was directed not to issue the permit applied for.

Appellant alleged in his petition that the General Assembly of Kentucky in 1922 enacted a law known as

the City Planning and Zoning Act (Acts 1922, c. 99), whereby cities of the first and second class were granted the power to create a city planning commission with power to make survey and plan of the city and the land contiguous or related thereto, and further to provide for the regulation of the height, area, and use of buildings, and for zoning of the city, together with such other power as was necessary to enable any city within either of the classes mentioned to adopt a zoning plan. He alleged that the General Assembly of Kentucky in 1924 (Acts 1924, c. 87) repealed the Act of 1922 referred to, and for that reason the city of Louisville, a city of the first class, was without power or authority to enact an ordinance in March, 1927, to create a city planning commission to make plans and surveys of the city of Louisville in order to enable the general council to divide the city into zones and to regulate the erection, alteration, and use of industrial or business property, and to exclude such business property from residence neighborhoods, so as to promote the health, safety, morals, and general welfare of the city. He alleged that in June, 1927, the general council of the city of Louisville passed another ordinance prohibiting for a period of two years the erection, construction, alteration, or use of property or buildings for business and industrial purposes in residence neighborhoods without the approval of the board of safety; defining residence neighborhoods; making certain exceptions and providing penalties for the violation of any of the provisions of the ordinance.

He alleged that the last-mentioned ordinance was unconstitutional because it denied the board of public safety any discretion upon an appeal to it by one feeling himself aggrieved by the refusal of the building inspector to grant a permit; that the board of public safety was compelled to follow literally the terms of the ordinance and deny a permit if by the provisions of section 2 of the ordinance of June, 1927, the permit was not allowable. Another ground on which he alleged the invalidity of the June, 1927, ordinance was that it suspended for a period of two years the laws and ordinances of the city in violation of section 15 of the Bill of Rights of the Constitution of Kentucky.

The alleged cause of action set out by appellant in his petition is bottomed on his allegations that the property which he describes as his is in truth and fact absolutely his, and that as long as he does not establish or

allow a nuisance thereon, the city, under its police power, may not in any way interfere with his use of his own property; and that the city was therefore without power or authority to adopt or enforce the zoning ordinance or the emergency ordinance, as each interfers with the full and free enjoyment of appellant of that which he alleges to be absolutely his own. It is his contention, well set out in his petition, that the ordinances deprive him of the full control and use of his property without compensation therefor first made, and that they provide for a taking of his property without due process of law and deny him the equal protection of the laws, in violation of his constitutional rights both state and federal.

The relief which he sought was that the board of public safety and the building inspector should be compelled by mandamus to issue to him a permit authorizing the construction of a gas and oil service station on his property. To conform with another contention of his that the board of public safety had arbitrarily refused him a permit and denied his appeal when it should have exercised a reasonable discretion, he prayed in the alternative that, if the court should be of the opinion that the ordinances are constitutional, the board of public safety should be compelled to hear his appeal and exercise a reasonable judgment in the determination thereof.

In their answer the board of public safety and the building inspector after joining issue on some of the allegations in the petition, particularly that one where it was alleged that the board of public safety did not exercise a reasonable judgment in determining the appeal of appellant, planted their defense squarely on the two ordinances referred to above and claimed the authority in the city to enact the ordinances and to conduct the affairs of the city covered by the ordinances in the manner therein provided.

Upon hearing before Judge Thomas R. Gordon, then judge of common pleas branch, second division of the Jefferson circuit court, a demurrer interposed by the appellant to the answer of appellees was overruled, as was also the motion for a writ of mandamus. The appellant refused to further plead, whereupon his petition was dismissed. The opinion of the learned judge of the lower court is exhaustive and fully covers all the questions raised on this appeal.

The ordinance creating a city planning commission of March, 1927, confers upon that commission power to

make a survey and plan of the city and surrounding territory which bears relation to the planning of the city; to provide for the regulation of the height, size, and use of buildings, and for zoning of the city and surrounding territory which bears relation to the zoning thereof, and provides for the appointment and employment of persons to carry out the purposes of the ordinance and makes an appropriation to defray the necessary expenses.

Section 2 of the city planning commission ordinance is as follows:

"Sec. 2.  For the purpose of promoting the health, the safety, the morals, or the general welfare of the city and surrounding territory in the county, bearing relation to the planning or zoning of the city, the commission, created by this ordinance, is hereby empowered in the manner and upon the conditions hereinafter prescribed:

"(A)  To make, establish and adopt plans and maps of the whole or any portion of the city and of any land outside the limits of the city and within the limits of the county, which, in the opinion of the commission, bears relation to the planning or zoning of the city.

"In such maps or plans and descriptive matter the commission may show its recommendations for the development of said territory including among other things such matters as the general location, character, and extent of streets, viaducts, subways, bridges, waterways, water fronts, boulevards, parkways, playgrounds, squares, parks, aviation fields, and other public ways, grounds and open spaces; the general location of public buildings and other public property; and the general location and extent of public utilities and terminals, whether publicly or privately owned or operated, for water, light, sanitation, transportation, communication, power, and other purposes; and the removal, relocation, widening, narrowing, vacating, abandonment, change of use, or extension of any of the foregoing ways, grounds, open spaces, buildings, or utilities, with the view to the systematic planning of the city and its environs.

"It shall have power to make, establish and adopt plans for the controlling, development, preservation and care of historical landmarks, for the design and location of statuary and other works of

art which are, or may become the property of the city or the county, and make recommendations to any public authorities or to any corporations or individuals in such city and its surrounding territory, bearing relation to the planning and zoning of such city, concerning the location of any buildings, or works to be erected or constructed by them.

(B) Such commission may provide for regulations to be made in accordance with comprehensive plan and designed to lessen congestion in the streets, to secure safety from fire, panic and other dangers; to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; and it may lay off and establish in the city and surrounding territory, which, in the opinion of the commission, bears relation to the planning or zoning thereof, zones or districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this ordinance, which zones or districts shall be designed by maps or plans, as well as by boundaries, and to make, adopt or establish maps or plans showing such zones or districts with appropriate designations thereof and within such districts to recommend regulations of and restrictions upon the erection, construction, alteration, repair, or use of buildings, structures or land, whether same be for trade, industry, residence, or other purposes. All such plans and recommendations shall be so drawn as to be uniform for each class or kind of buildings throughout each district or zone, but the regulations in one district or zone may differ from those in other districts or zones. Such commission shall further have power to recommend amendments and supplements of the regulations and zoning maps.

"(C) To enter upon any lands and make examinations and surveys for the purpose of exercising the general powers hereinbefore granted.

"(D) To make, print and publish and distribute generally copies of any plan, map, report or recommendation made by it, and may employ such other means of publicity and education as it may determine."

Following this section, subsequent sections provide that the commission, before finally laying off or establishing any zone or district either within the limits of

the city of Louisville, or outside of the limits, or before it shall make, adopt, or establish any final plans or maps with reference to said zones or districts for the character of public or private use of improvements thereof, shall first embody its conclusions in a preliminary or tentative report, and of such tentative report public notice shall be given by publication in newspapers in general circulation fixing the time and place when and where objections to the preliminary or tentative report will be heard and considered by the commission. After hearing objections, if any, the commission shall make up its final report accompanied by maps or plans and shall send it, accompanied by any objections offered, to the general council with recommendations to that body.

It is thus seen that the city planning commission ordinance of March, 1927, is advisory in its nature. The matter is left finally to the general council. The effect of that ordinance is that the city is preparing to enact a general zoning ordinance after having obtained expert information to guide the legislative body in the preparation and enactment of such an ordinance. This is in accordance with best practices. In undertaking a matter so important as a general zoning ordinance, the city authorities must necessarily, if the best results are to be obtained, move with caution. Zoning ordinances and laws do not look to the past so much as to the future. Where mistakes have been made in the past, zoning must recognize actual conditions and follow such plans as will be best under all the circumstances. The city planning commission, when it was created, was confronted with a large and important undertaking. The entire city was to be the scene of its operation, and the duty was placed upon it to obtain such data and information as would enable it to make recommendations to the general council looking towards the enactment of an ordinance which would be for the public safety, health, morals, and general welfare of the entire city.

The governing authorities of the city must have recognized that the city planning commission could do little good if property owners should be allowed to change conditions after necessary information and data had been obtained, and before a final report had been made to the general council. To prevent a change in conditions in so far as possible after the city planning commission was created, the general council enacted the

emergency ordinance of June, 1927. Sections 2 and 3 of that ordinance read as follows:

"By a residence district, zone, neighborhood or section of the city of Louisville, is meant the land fronting on both sides of any public street or court where less than twenty-five per cent. of the frontage is now used, or designed for business or industrial purposes within a distance of three hundred (300) feet of the center of the place where any building for business or industrial purposes is sought to be used, erected, located, constructed or altered, provided that if the distance from the center of the location of such proposed building for business or industrial purposes on the same side of the street is less than three hundred (300) feet to the next intersecting street, the nearest street line of such intersecting street shall be the limit of the residence zone or district in that particular direction and on both sides of the street.

"An intersecting street, as used herein, shall mean any street or public way or court, thirty (30) feet or more in width, which joins another at an angle, whether or not it crosses the other.

"Buildings or vacant ground used or sought to be used for farming, truck gardening, the growing of trees, shrubs, vines or plants, professional or other customary home occupations conducted by a family within its residence, and the conduct of a boarding or lodging house not primarily for transient guests, shall not be affected by the terms of this ordinance.

"Sec. 3. Before issuing any building permit for the erection or alteration of a building for business or industrial purposes, the city building inspector shall first determine whether such proposed building is to be erected, constructed or altered in a residence neighborhood, zone or district as herein defined, and if so, he shall refuse to issue such permit. It shall be the duty of the applicant to furnish to the building inspector all information necessary to enable him to determine the character of the zone in which such building is proposed to be erected, constructed or altered."

This ordinance was enacted to maintain the status quo of conditions while the city planning commission was gathering data and information to be used as the basis of

its report to the general council.   The ordinance makes it the duty of the city building inspector, before granting a permit for the erection or alteration of a building for business or industrial purposes, to first determine whether such proposed building is to be erected, constructed, or altered in a residential neighborhood, zone, or district as defined by section 2 of the ordinance. If he advise that a business or industrial building is contemplated in a residential neighborhood, it is made the duty of that office to refuse the permit. The applicant for the permit is required to furnish the building inspector all information necessary to enable him to determine the character of the zone in which such building is proposed to be erected, constructed, or altered.   An appeal is granted to any person who has been denied a permit by the building inspector to the board of public safety.   A copy of the application for the permit must also be filed with the city planning commission.   The board of public safety, after notice and hearing, is required to determine whether the erection or alteration of the proposed building for business or industrial purposes will be destructive or injurious to the pending plan of city zoning.   Evidence may be offered by the applicant or the city planning commission.   Within 30 days after the hearing the board of public safety is required to approve or disapprove the application and to return it to the building inspector with its action indorsed thereon.   If the board of public safety approves the application, the building inspector is required to issue the permit.   But if it disapproves the application the applicant may not proceed with the erection or alteration of the building.

The appellant, when his application was refused by the building inspector to erect a gas and oil service station on his property, appealed to the board of public safety, which board disapproved his application.   He attacks the validity of both ordinances in the outset on the ground that the city of Louisville has no authority to enact a zoning ordinance.

Zoning ordinances are creatures of recent development.   They had their beginning in this country about 25 years ago, but their growth in number has been very rapid until nearly every state of the Union contains cities which have enacted zoning ordinances.   These enactments are under what is commonly called the "police power."   The people of every state have the inherent right to pass laws for the public safety, health, morals,

and general welfare. The police power rests in the Legislature of the state, and no subdivision of the state may exercise that power except through a grant made by the people of the state through its legislative branch. Police power cannot well be defined. The state employs it for fire protection, sanitary regulations, and for preventing the spread of epidemics. Fireproof requirements, regulations of plumbing, tenement houses, and construction requirements are but other illustrations of what we denominate the police power of the state. Generally speaking, the courts uphold such regulatory measures if they are related to health, safety, morals, and the general welfare of the community. Uusally upon a strict scrutiny of such laws, if the courts find that they are not related in some way to health, safety, morals, and general welfare, they will be declared invalid as an unconstitutional exercise of power by the legislative branch of the government. Unless zoning in cities can be done under the police power of the state, it would be exceedingly difficult, if not impossible, to do it otherwise, as we can hardly perceive how it might be accomplished through the exercise of eminent domain.

Unless the city of Louisville has been granted the right to exercise such police power by the legislative branch of the state, it cannot do so. The General Assembly of Kentucky in 1922 enacted a law known as the City Planning and Zoning Act, wherein it conferred upon and granted to cities of the first and second classes the power to create a city planning commission with authority to make a survey of the city and the land contiguous or related thereto for the purpose of enacting legislation by ordinance to provide for the regulation of the height, area, and use of buildings, and for the zoning of the city. The General Assembly in 1924 repealed the Act of 1922. We do not know the reasons which actuated the legislative branch of the government to withdraw the power granted in the former act. If cities of the first class were possessed of the police power at the time of the enactment of 1922, that law may have added to the power already possessed, but it took nothing from them. If police power had already been conferred upon a city of the first class sufficient to enable it to do what it is proposing to do in the two ordinances referred to, the repeal of the act in 1924 did not take anything from the city. It is necessary, therefore, to determine from the provisions of the charter of the cities of the first class whether such

city has had conferred upon it the police power which had previously rested in the legislative branch of the state government. The power of the city of Louisville to pass ordinances is found in sections 2742 and 2783, Ky. Stats. These two sections are as follows:

"That the inhabitants of cities of the first class are hereby continued corporate by the name and style which they now bear, with power to govern themselves by such ordinances and resolutions for municipal purposes as they may deem proper, not to conflict with this act, nor the Constitution and laws of this state, nor of the United States; with power to contract and be contracted with; to sue and be sued; to defend and be defended in all courts; to acquire property for municipal purposes by purchase or otherwise; to hold the same and all property and effects now belonging to them, either in their own names or in the names of others, to the use of the city, for the purposes and intents for which the same were granted or dedicated; to use, manage, improve, sell and convey, rent or lease the said property, and have the like powers over property hereafter acquired; to have a common seal, and change it at pleasure, and act with or without a seal."

"Sec. 2783. The general council shall have power to pass, for the government of the city, any ordinance not in conflict with the Constitution of the United States, the Constitution of Kentucky and the statutes thereof."

This court had before it in the case of City of Louisville v. Wehmhoff, 116 Ky. 812, 76 S. W. 876, 25 Ky. Law Rep. 995, the question of the extent of the police power of the city of Louisville under its charter. It was made to appear in that case that the cities in the state with a lower classification than that of the first class were in specific language given the authority by the Legislature to pass ordinances affecting the public safety, health, comfort, convenience, and morals, but that no such specific language was used in the charter of the city of Louisville. The court held that the failure to use such specific language did not show an intention to give the city of Louisville less power than that conferred on other cities. The court there said:

"We must presume that that body intended to vest in the local legislative board of the largest city

in the state at least as much power with respect to passing by-laws for the police regulation of its inhabitants, and for the conservation of the morals and welfare of that population, as was given to the lesser towns and cities. In all the others, specific authority is granted to them to pass by-laws to suppress and punish nuisances. In defining the powers of the legislative bodies of all the other municipalities, they are minutely given, with reference to enumerated specific subjects. In the grant to cities of the first class there is an entire absence of such careful restriction. This alone, in view of the ample general terms employed, would seem to indicate that the powers granted the first-class cities over such subjects were broader and more comprehensive than those granted the others.''

Again, in the case of Buchanan v. Warley, 165 Ky. 559, 177 S. W. 472, Ann. Cas. 1917B, 149, this court held that a zoning ordinance enacted by the general council of the city of Louisville, based on races that should dwell within the particular zones, was valid. The court there said:

"Nor are we disposed to concede that the ordinance here involved transcends the authority of the municipal legislature, or to doubt that it constitutes a valid exercise of the police power and a reasonable and expedient measure for the public welfare.''

It is true that the Supreme Court of the United States reversed the case, but its reversal did not affect the decision of this court on the points under discussion. It would appear that if this court found that the city of Louisville had authority, under its charter, to pass an ordinance regulating the use of property on account of race, it likewise has the authority to regulate the use of property for the purpose of business, trade, and industry.

As to the extent of the police power exercised by cities, we are enlightened by the opinion of this court in the case of Silva v. City of Newport, 150 Ky. 781, 150 S. W. 1024, 42 L. R. A. (N. S.), 1060, Ann. Cas. 1914D, page 613. A question there arose at to the power of the gov-

erning authority of the city to pass an ordinance under the police power.  The court there said:

"The power here conferred is as broad as the police power of the state, as it authorizes the council or board of commissioners of cities of the second class to pass any ordinance which would be promotive of any of the ends mentioned in the statute."

It is our conclusion that the charter of the city of Louisville contains authority for the city to pass and enforce the ordinances as against appellant under consideration in this litigation.

It is argued by appellant that the right of private property is absolute, conferring upon the owner the absolute right to use and enjoy it as he himself may determine without interference or limitation, and that this absolute right of the individual to hold, maintain, improve, and enjoy his property has only two limitations. One is that the state has the right to exercise or delegate the right of eminent domain, and the other that it has the right under the police power to appropriate, curtail the use of, or destroy, private property when such appropriation or limitation is regarded essential to the public health, public safety, or the well-being of the public at large.  Appellant relies on the constitutional guaranties, both Federal and state, that it is a denial of the equal protection of the laws to take his property for public purposes without just compensation, and that to do so is to deprive him of his property without due process of law.  It is insisted that the city of Louisville cannot limit the free use of his property for the public good without making just compensation to him for its value.  It is argued that the doctrine of the police power of the state rests upon the law of self-protection, or self-preservation, and that it cannot be invoked except at times when its exercise is necessary to protect a part, or the whole of the body politic.  All of the arguments advanced by appellant have been fully answered by the Supreme Court of the United States in the case of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303.  That case involved the validity of an ordinance in the city of Euclid, Ohio, a suburb of Cleveland.  It was a comprehensive ordinance excluding business from residential neighborhoods as well as establishing comprehensive zones for the regulation and restriction of the location of trades, industries, apartment houses, dwell-

ing houses, and regulating the area of lots upon which buildings were to be erected, as well as the size and height of the buildings. The Supreme Court upheld the constitutionality of that ordinance. We quote from that opinion as follows:

"The serious question in the case arises over the provisions of the ordinance excluding from residential districts, apartment houses, business houses, retail stores and shops, and other like establishments. This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded. Upon that question this court has not thus far spoken. The decisions of the state courts are numerous and conflicting; but those which broadly sustain the power greatly outnumber those which deny it altogether or narrowly limit it, and it is very apparent that there is a constantly increasing tendency in the direction of the broader view. We shall not attempt to review these decisions at length, but content ourselves with citing a few as illustrative of all."

The Supreme Court found that which seems to be true, that is, that the decisions of the state courts on these questions are numerous and conflicting. It was found by that court, however, that the courts which broadly sustain the power greatly outnumber those which deny it altogether or limit it within a narrow scope. We refer to the opinion in that case following the quotation above for the numerous cases cited which sustain the broader view as well as the cases which sustain the contrary view.

The Supreme Court then proceeded to analyze the reasoning of the various courts in upholding the validity of zoning ordinances, and thus reached its own conclusions:

"If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbi-

trary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. Thomas Cusack Co. v. Chicago, 242 U. S. pp. 530, 531, 61 L. Ed. 475, 476, L. R. A. 1918A, 136, 37 Sup. Ct. Rep. 190, Ann. Cas. 1917C, 594; Jacobson v. Massachusetts, 197 U. S. 11, 30, 31, 49 L. Ed. 643, 651, 652, 25 Sup. Ct. Rep. 358, 3 Ann. Cas. 765.''

We quote further from the same opinion as follows:

''Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise.''

It was well said by the Supreme Court that the meaning of constitutional guaranties never varies, but the scope of their application must expand or contract to meet the new and different conditions which are constantly arising.

We are not bound to follow the opinion of the Supreme Court in defining the extent of the police power of our own state, but the opinion of that court in the case, supra, is entirely in accord with our own judgment about such matters. We are therefore content to adopt the quotations above set out from that opinion as

the law on the subject in this state, and in doing so we determine that the contention of appellant that his rights guaranteed to him by the Constitution, both Federal and state, have been invaded, is without merit.

Many able opinions are cited by counsel for appellee from other jurisdictions upholding similar zoning ordinances, but none of them add anything to the opinion of the Supreme Court in the Euclid case, and no good purpose would be served by taking up the space to cite them. Any one interested in the questions involved will find them cited in the Euclid case.

Another attack made on the emergency ordinance is that the general council was without authority to pass an ordinance of a temporary nature. We find that question discussed and answered in the case of Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 38 A. L. R. 1479, where the Supreme Court of California said:

"It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day; therefore we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan.

"It follows, it seems to us, that the fact that comprehensive zoning in the instant case had not matured to the point of being an enacted and existing ordinance, at the time the emergency ordinance in the instant case was enacted, does not detract from the validity of the latter ordinance upon the theory that there could be no assurance that the contemplated zoning ordinance would be ultimately enacted and enforced. The good faith of the council in enacting the ordinance in question is not challenged; nor is it asserted that the council will not proceed in good faith to the enactment of a general zoning ordinance and, in the absence of any issue concerning the good faith of the council, the presumption of fair dealing on the part of the council and the further presumption that they will not fail in the performance of an official duty must prevail.

That being so, it may be fairly said, we think, that the ordinance in question, being, as it declares, an initial unit in the general zoning of the city, is part and parcel of a comprehensive plan which has relation to the welfare of the city as a whole and therefore it must be held that the ordinance in question is a valid exercise of the police power.

"The judgment is affirmed."

Again we find ourselves in accord with the opinion of another court which has had this question before it. The foregoing quotation correctly expresses the law, and for that reason the contention of appellant on that point is without merit.

Another ground urged against the emergency ordinance is that it suspends the building laws of the city. We do not think so. Judge Gordon, who tried the case below, in upholding the validity of this ordinance said:

"It follows from these views, and the court concludes, that the ordinance under consideration is not invalid on the ground that it deprives a citizen of his property without due process of law; that it does not suspend the building laws of the city; that it is not an unreasonable or arbitrary exercise of power over the property rights of a citizen; and the fact that it is for a stipulated period of time, to wit, two years, does not affect its validity."

We agree with him in his expressed conclusions.

It is argued by appellant that the emergency ordinance is unreasonable and arbitrary. This might be a more available argument if the ordinance was to continue through a long period of time, but it is only temporary in its nature and the purpose of its enactment was to aid the city planning commission in its work. For that reason we will not scrutinize the temporary ordinance with the same degree of care and strictness that we would if it had been enacted as a permanent ordinance. It is argued that no definite rule for forming residential zones is fixed by the emergency ordinance, but section 2 of that ordinance appears to afford a reasonable definition of residential zones when considering the purposes for which the ordinance was enacted. A "residence zone," as defined by that ordinance, means the land fronting on both sides of any public street or court where less than 25 per cent. of the frontage is now used or de-

signed for business or industrial purposes, etc.  It is suggested by appellant that the owner of the property is the one who knows for what purpose the property is "designed." We believe the learned counsel misconstrues the meaning of the word "designed" as used in that ordinance.  It means something more than what the owner has in his mind.  There must have been some overt act, or some setting apart of the land for a business or industrial purpose, before it can be said that it has been designed for that purpose.  The ordinance refers to the date of its enactment, and unless the land at that time had been designed for business or industrial purposes it could not be designed for such purposes while the ordinance was in effect.

It is contended by appellant that the board of public safety arbitrarly refused to grant him a permit because in its opinion it was prohibited from so doing by the strict letter of the ordinance. We cannot agree with that. As we read the ordinance, it allows an appeal to the board of public safety so that board may determine whether the granting of the permit and the erection of business houses in particular neighborhoods will be injurious to the comprehensive plan of zoning.  We are of the opinion that the board of public safety has a discretion in the matter, and if it should grant a permit in violation of the strict letter of the ordinance it would not be assuming legislative powers, but would be carrying out the spirit of the ordinance, and we find authority for the board to so exercise its judgment; a court should not set aside the determination of public officers unless it is clear that their action is without any reasonable foundation, and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety, or the public welfare in its proper sense.  Nectow v. City of Cambridge et al. (decided May 14, 1928) 48 S. Ct. 447, 72 L. Ed. ——.

The ordinances are valid, and the board of public safety has authority to exercise a reasonable discretion in determining whether permits shall be granted, and we cannot say that the board abused that discretion in this case.

Judgment affirmed.