## Mansbach Scrap Iron Company v. City of Ashland et al.

Decided June 17, 1930.)

(Rehearing Denied Sept. 26, 1930.)

266

WOODS, STEWART, NICKELL & SMOOT for appellant.

JOHN T. DIEDERICH for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Affirming. .

The appellant, Joseph Mansbach, doing business as Mansbach Scrap Iron Company, is questioning the constitutionality of provisions of an ordinance of the city of Ashland requiring, as a prerequisite to obtaining a license to do business as a dealer in junk, that he consent in writing to the inspection and search of his business premises by police officers of the city.

The objectionable portion of the ordinance is as follows:

"That all applicants for permits for the operation of junk shops, automobile wrecking shops and pawn shops in the city of Ashland, Ky., shall at the time of making application for said permits make and execute with the Clerk of the City of Ashland a permit signed by the applicant providing that the Police Department of the City of Ashland, Kentucky, by and through the Chief of the Department, or any member thereof, may inspect and search the said shop or place of business. This permit for inspection and search shall be filed with the Clerk and shall be attached to said application applied for and shall be considered a part of said application."

Pursuant to this ordinance there was prepared a form of application for license for conducting the three classes of business which called for the disclosure of certain facts and included this stipulation:

"I do solemnly swear that my business conducted at ................, in the City of Ashland, Kentucky, shall be operated in a quiet, orderly and law abiding manner, and that the Chief of Police, or any member of the Police Department shall have permission to visit and inspect and search the place of business at any time."

The appellant struck out the consent provision in making his application, and upon refusal of the city clerk to issue the license, he brought this suit against the city and certain officials. He asked that the portion of the ordinance objected to be held invalid and for injunctive relief.

The grounds upon which the validity of the provision is assailed are that it contravenes sections 2 and 10 of the Constitution, the former because it is the exercise of an arbitrary power over the liberty and property of freemen, and the latter as invading the security against unreasonable searches.

In our approach to a consideration of the issue it is well to note that a city is a political subdivision of the state, created as a convenient agency for the exercise of such governmental powers as may be intrusted to it. The city of Ashland derives its authority in this instance from section 181 of the Constitution and sections 3038 and 3058-2 of the Statutes, the latter section giving specific power to "license, tax and *regulate*" junk dealers and secondhand dealers, and also to "license, tax and *suppress*" pawnbrokers.

The police power is an attribute of sovereignty, and within the limits of its sovereignty a municipality has wide discretion in determining its own policy and what measures are necessary for the protection and promotion of the safety and good order of its people. Its use of the power to that end in regulating, restricting, and prohibiting commercial and personal activities is multifarious. The constitutional limitations on that use are, obviously, dependent uponthe character of evil and degree of danger sought to be avoided. If there is any foundation for the regulation, or if the nature of the business or calling is such that a reason can be given for apprehending a public peril from its unrestricted pursuit, then the action of the legislative body is conclusive. But it has often been declared that legislation may not under the guise of exerting the police power arbitrarily, or after the manner of a despot, impose restrictions that are unnecessary and unlawful upon the use of private property or the pursuit of useful activities. This measure, exacting a consent to reasonable surveillance of the place of business, must therefore find its justification in bearing a substantial relation to public health, safety, morals, or welfare. Hoblitzel v. Jenkins, 204 Ky. 122, 263 S. W. 764. Whether or

not it has that relationship is for the courts to determine. Burns Baking Co. v. Bryan, 264 U. S. 504, 44 S. Ct. 412, 68 L. Ed. 813, 32 A. L. R. 661.

There is a marked distinction between enterprises or commodities which are: (1) Dangerous or injurious per se, which may be prohibited; (2) those which are potentially so, which may only be regulated; and (3) those which are instrinsically harmless, which are not su'bject to the exercise of police power. These distinctions are noticed in Tolliver v. Blizzard, 143 Ky. 773, 137 S. W. 509, 34 L. R. A. (N. S.) 890, a case which related to an ordinance dealing with nonintoxicating soft drinks.

The Bill of Rights grants no privileges. It conserves them subject, however, to the dominant rights of the people as a whole. The Supreme Court has many times declared that where the public interest is involved it is to be preferred over the property interest of the individual, even to the extent of its destruction, if necessary. Miller v. Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 508. This bulwark of liberty is not stagnant or inelastic. The police power—though assuredly exercised in subordination or supplement to the principles of the Constitution—permits progress and makes of the Bill of Rights a growing and living instrument. It seeks to preserve a proper balance between the rights of all the people on the one hand and the rights of the individual on the other. Thus it is written in Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016:

"Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. . . . In this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning,* but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall."

Some of these expressions were adopted by this court in Fowler v. Obier, 224 Ky. 742, 7 S. W. (2d) 219.

The Constitution, dealing as it does in broad outlines and general formulae, through interpretation and a practical adaptation is made conformable to an existing sense of public right and necessity.

We are not unaware of the prevalence of crime, organized and unorganized, and the need for checking its operations in every legal way. The nature of the business of dealing in junk and secondhand goods makes it peculiarly the subject of strict regulation, for it affords a convenient and ready market for the disposition of stolen goods. It is, to be sure, a legitimate business, meeting a public demand, but it is the history of experience that it is sometimes conducted in a dubious fashion and becomes a place where thieves turn into cash their ill-gotten plunder. It is, perhaps more often, an innocent receiver of contraband goods. Hyman v. Boldrick, Judge, 153 Ky. 77, 154 S. W. 369, 44 L. R. A. (N. S.) 1039; Co-Operative Junk Co. v. Board of Police Commissioners, 38 Cal. App. 676, 177 P. 308. Moreover, such places garner inflammable material and gather disease-laden substances. It is therefore a business having a potential danger to public peace, to public safety, and to public health. 10 R. C. L. 862. It is not surprising then that junk dealers and pawnbrokers have called forth regulations stricter and more extreme than most any other business short of annihilation or prohibition altogether. Since 1878 this state has had a statute strictly regulating pawnbrokers, prescribing the hours in which they may do business, requiring registers and reports, and fixing rather heavy penalties for its violations. Section 3787 et seq., Kentucky Statutes. The constitutionality of that statute has never been quesioned, for it has been undoubtedly recognized as a proper use of the police powers of the Commonwealth. In Hyman v. Boldrick, Judge, supra, this court upheld an ordinance making it unlawful for any pawnbroker, secondhand dealer, or junk dealer to keep open his place of business between certain hours. It was held that the nature of the business supported the reasonable regulation contained in that ordinance.

In Cornelius on Search and Seizure, p. 87, upon abundant authority, it is declared:

"The constitutional provision in question, while primarily designed to protect the individual in the

sanctity of his home and in the privacy of his books, papers and property, does not apply to reasonable rules and regulations adopted in the exercise of the police power for the protection of the public health, morals and welfare. Consequently, no right is violated by a statute or ordinance which requires pawnbrokers to obtain licenses and to keep books showing their transactions and to submit such books and the goods received in pawn to official inspection, or requiring dealers in food to furnish samples of their wares for inspection and analysis, and providing for the seizure and destruction of food unfit for human consumption or requiring automobiles to carry numbers.''

In 30 A. L. R. 1427, we have an elaborate annotation covering the subject of regulation of junk dealers, and it will there be seen that the business is everywhere recognized as a legitimate object of license and control by municipalities. Ordinances have been sustained which made it necessary, as a condition precedent to obtaining a license, that the applicant obtain the consent of adjacent property owners to its establishment; also, that the applicant agree that his license might be revoked at the will of the city. Others contained provisions which barred them from certain localities; required the keeping of records of their transactions and an accurate description of the goods purchased; required the retention of such articles for a stated period of time before disposing of them; prohibited the purchase of such articles from specified classes of persons; prohibited the purchase of certain articles from any but designated classes of persons; prohibited the employment of any person under twenty-one years of age in the business. There is little difference in requiring specific consent to a regulation and the acceptance of a license subject to regulatory provisions in the ordinance under which it is granted. See also 43 C. J. 390, 410; and City of Grand Rapids v. Braudy, 105 Mich. 670, 64 N. W. 29, 32 L. R. A. 116, 55 Am. St. Rep. 472; Sanning v. City of Cincinnati, 81 Oh. St. 142, 25 L. R. A. (N. S.) 686. Compare Leonard & Leonard v. Earle, 279 U. S. 392, 49 S. Ct. 372, 73 L. Ed. 754, holding valid a Maryland statute requiring as a condition precedent to obtaining a license that oyster packers agree to deliver to the state 10 per cent. of the shells to be used in propagation and conservation of the industry.

When one engages in the business of buying and selling goods at a public place, although on his own premises, he must expect—indeed, he invites—people to resort there, and that of itself is a consent for police officers to visit the place.

Regulations like that challenged are a protection of and should be welcomed by honest business men. Mutual interest of the proprietor and the public invites inspection. It is not out of place to refer to a case in which this appellant secured the reversal of a conviction of the crime of receiving stolen property knowing it to have been stolen. Mansbach v. Commonwealth, 230 Ky. 604, 20 S. W. (2d) 468. His manifestation of good faith in having complied with an ordinance of the city of Ashland in reporting to the police department the purchase of the junk which had been stolen and in having invited a search of his premises had a controlling effect in the decision of this court that the evidence destroyed any presumption of guilt arising from the possession of the stolen property and entitled him to a directed verdict of acquittal.

The imposition of a condition to the granting of a license for police regulation, as distinguished from a license for revenue, is by no means novel or confined to one class. We have the familiar exactions of proof of professional qualifications, of evidence of fitness for certain trades, of the right of inspection and condemnation of dairy products and other foodstuffs, and the numerous sanitary and fire prevention regulations, as well as those controlling similar conditions. Each of these is a limitation on the liberty of earning a livelihood and holding and using one's property as he desires. Nevertheless such regulations have withstood attack as being the result of arbitrary and unreasonable action and others have not even been questioned. In all instances where there is such an authorized condition attached, an applicant is not entitled to the license by merely paying or tendering the fee or tax demanded. 37 C. J. 238.

It cannot be gainsaid that those whose business and operations are covered by the challenged ordinance may voluntarily waive the production of a search warrant. Indeed, Mr. Justice Holmes has recently observed that there are few constitutional rights that may not be waived. However, it is equally as well settled that under ordinary circumstances, if consent or waiver is obtained through deceit or coercion it cannot be deemed

voluntary, and evidence obtained under it is inadmissible on a trial. Cooley, Constitutional Limitations, p. 631; Coleman v. Commonwealth, 219 Ky. 139, 292 S. W. 771; Duncan v. Commonwealth, 198 Ky. 841, 250 S. W. 101. But is the exaction of the right of inspection and search—a term which need not frighten, for it is only a more minute inspection or exploration—such coercion as it comprehended by the law? Is it not rather the terms of an agreement between the city and one who conducts the business—a condition which may be exacted under the city's legitimate regulatory power? In consideration of the license to carry on a business of potential danger to the public welfare, the applicant is required to yield to measures designed to protect the public interest. It is the surrender of a right for a privilege.

In Richardson v. Commonwealth, 205 Ky. 434, 266 S. W. 1, it was held that a search of the accused's dwelling was valid where he had given his consent to it in consideration of the granting by the officers of a favor to him.

In Cassidy v. Drake, 154 Ky. 25, 156 S. W. 1032, it was held that a city authorized by the statute to regulate saloons might prescribe by ordinance that every license issued in pursuance thereto should be issued with the distinct agreement, understanding, and condition that same should be revoked by the mayor for a violation of any of its provisions. Holding that the restrictions were reasonable, it was further declared that there could be no doubt of the city's right to make the revocation or forfeiture a condition in issuing the license, and where a violation of them had occurred the revocation was justified and lawful.

It is not so evident that we can say *a priori* that the exaction of a waiver of the presentation of specific legal process to support an inspection or search is one forbidden as arbitrary or irrational or that it transgresses the constitutional right of an unreasonable search of one's business property.

The judgment is affirmed.

Whole court sitting.

Chief Justice Thomas and Judge Logan dissenting.

DISSENTING OPINION BY CHIEF JUSTICE THOMAS.

Municipalities in this country have no such right as inherent police powers. 43 C. J. 205, sec. 204. Whatever authority they may exercise under that elastic and undefinable thing denominated in the law "Police Power" must be derived from the Legislature or Constitution within the jurisdiction or sovereignty where they are located. Therefore whatever police power the city of Ashland possesses must be found to emanate from its charter, and I agree with the opinion that it has authority under such power to *regulate* junk dealers. But, as stated in the opinion, it does not have the authority under that or any other power to *prohibit* entirely the carrying on of the business of a junk dealer. The police power when and wherever it exists may be exercised by two methods, one of which is "The regular municipal method of exercising police functions is by the enactment of ordinances, of regulation or prohibition, the former usually prescribing fees and licenses." 43 C. J. 248, sec. 248. The exercise by that method usually applies to existing subjects of regulation and takes the form of an ordinance imposing permissible restrictions and burdens on the subject or business regulated.

To make a concrete illustration of the present case: If the city of Ashland had ordained that, "It shall be unlawful for any junk dealer within the corporate limits of the city of Ashland to refuse any peace officer the right to search his premises wherein his business is conducted without a search warrant," and had then fixed a penalty for such refusal, the above first method of exercising authority under the police power now under consideration would have been followed; but I feel sure that none of my brethren, who joined in and agree with the majority opinion, would for a minute contend that such an ordinance would be valid. However, if I should be mistaken and they would so agree, then my research confirms the fact that they would be the only members of a court of last resort who did so agree. In section 226, p. 225, same volume C. J., it is stated: "Municipal powers are subject to limitations of both the federal and the state constitutions. The legislature cannot delegate to a municipal corporation a power violative of constitutional provisions. A municipality can neither deny nor *abridge* any of the rights protected by the constitu-

tional guaranties, it may not pass any ex post facto ordinance; nor any ordinance which violates the obligation of contracts; nor regulate interstate commerce; nor deprive any person of life, liberty, or property without due process of law; nor confiscate property of one person for another's benefit; nor take private property without just compensation. It cannot make the exercise of a constitutional right subject to the discretion of municipal officials. A city council may not authorize a railroad company to take or injure private property. Whatever the state is forbidden to do is of course equally prohibited to its creature, the municipal corporation. Also, whatever private rights of person or property the people of the state have specially guaranteed or protected by their bill of rights or state constitution against infringement by any power are beyond the reach of municipal authority; and whatever acts they have prohibited the state government from doing are equally prohibited to municipal government.''

The next section, on page 226, says, inter alia: ''The police powers of a municipal corporation falling as they do within the rules just discussed must be exercised subject to provisions both of the state and of the federal constitutions, . . . and hence, so long as municipal bodies confine their enactments within the proper limits of such power, they do not violate the private rights of the individual. The limit imposed is that the requirements, whatever they may be, must be reasonable,'' etc. Every text-writer and every opinion of every court that I have been able to find on the subject would therefore say that an ordinance, of the nature and character of the above-supposed one, would be absolutely void as violative of a most sacred right of the citizen, guaranteed to him by section 10 of our Constitution, forbidding searching of one's person, houses, papers, and possessions without a warrant therefor, based upon probable cause supported by oath or affirmation. That guaranty is a part of our Bill of Rights and is, at least, as much sacred as any other guaranteed right by the Constitution. It was not only intended to guarantee one's privacy, at least as applied to his dwelling, but it was also intended to guarantee immunity against furnishing evidence against himself, a right guaranteed by section 11 of the Constitution, which is also a part of our Bill of Rights.

I will not undertake to elaborate or even cite the great number of texts, opinions, articles, and other sorts of publications extolling the constitutional guaranty against unreasonable seizures and searches. It is sufficient to say that the excerpts from Corpus Juris find unanimous approval in all of the publications referred to and there exists no opposing ones. I repeat, then, that the supposed ordinance would be invalid for the reasons stated.

The other and second method by which a municipality may function in the exercise of its police power is by imposing a system of license taxes, or regulatory permits, to engage in the particular business proposed to be regulated and dealt with. It looks to a complying with a condition precedent to the embarking in the regulated business, while the first method supra lays its hands upon an already existing business, and directly forces its regulating provisions upon it. Both methods are for the accomplishment of the *same* purpose, and the authority of the municipality to employ them emanates from the same source, to wit, the police power. I therefore would like to inquire: Wherein is the distinction between the two methods so far as the constitutional right of the municipality to employ them is concerned? The one seeks to directly violate section 10 of our Constitution; while the other seeks to accomplish the same purpose but indirectly with the aid of a coerced agreement as a condition precedent to entering into the proposed business by the applicant whereby he under duress surrenders the same guaranties furnished him by the same section of the Constitution. The latter, to my mind, is more iniquitous and embodies a less excusable intent to violate the Constitution than does the first method. We often read in the law books that, what a person, a state, or a municipality may not do directly is likewise forbidden to be done indirectly, and to my mind the ordinance involved in this case is one of the most glaring attempts to pursue the indirect method of violating a constitutionally guaranteed right that has come under my observation.

I agree that under the term "regulation" many things may be done and requirements exacted for the benefit and protection of the public at large, but always limited by the requirement that the exactions must be

*reasonable* and proportioned to the evil sought to be overcome, and which the opinion expressly approves, and it is in conformity with all opinions and writers upon the subject. But the trouble with the opinion, according to my view, is that it loses sight of the boundary line of "reasonableness" when it permits a municipality to exact as a condition precedent to engaging in a lawful business, though subject to regulation under the police power, a coerced agreement that the applicant shall consent to a search of his place of business by *police officers* without a search warrant and which is in direct defiance of the guaranties contained in section 10, supra, of our Constitution. I have not overlooked that in the annotations to the case in 30 A. L. R. 1427 (referred to in the opinion) a number of what might be termed stringent regulations and conditions may be imposed upon one engaged in the junk dealing business, some of which are enumerated in the opinion, and they are: That the applicant obtain the consent of a designated number of adjacent property owners; that he agree for a revocation of his license upon certain infractions; that his business be barred from certain localities, or, in other words, zoned; that he be required to keep records of certain transactions not difficult to do, and furnish them periodically to designated peace officers; that his hours of business be limited; that he should not deal with infants, etc.

But the opinion overlooks the *important* and *controlling* fact that none of the exactions in any of the cases is in contravention of any *guaranty* found in the Constitution. All of them clearly come within the *reasonableness* of a regulation adapted to the particular business. If, for instance, the Constitution contained a provision *against* zoning certain classes of business, or against exacting consent of neighbors to transact business in a particular locality, or against any other of the restrictions that have been upheld (and some of which are cited in the opinion), then I have no doubt that the annotated opinions would have been written differently from what they were.

If the condition here involved is legitimate as not transcending the limits of a valid exercise of the police power, then the city of Ashland could likewise require, as a condition precedent to granting any license to any business that may be so regulated, that the applicant

should waive in advance his immunity from furnishing evidence against himself as contained in section 11 of the Constitution by forcing him to execute a coerced agreement to testify against himself if he should be apprehended on a charge of receiving stolen property; or, if he should be apprehended for violating the ordinance or for any other discovered offense growing out of the conducting of his business, that he would waive a jury trial guaranteed to him by section 7 of the Constitution, and submit his case to a court having jurisdiction. If there is any distinction between the supposed cases and the actual one we have it is, to my mind, so thin and shadowy that it fades into invisibility, and the same remark may be made as to the supposed distinction between the first and second methods, supra, of exercising the police power.

The modern tendency, I regret, seems directed towards the making of inroads upon constitutional guaranties and protections, and, bit by bit, they are being eaten away, and the most unfortunate part of it is that the processes by which it is done have even received the approbation of many courts, which are the last bulwark for the salvation and protection of such sacred rights, both to the individual and to society in general. For one, I deplore it and view the outlook with alarm and believe that the time has come when a firm stand should be taken, not only against any advance in such encroachments, but to remedy as much as possible what has already been done in that direction. In so saying I do not mean to advocate any limitations upon the legitimate exercise of that influential, undefinable, and comprehensive doctrine of the law, known as the "police power;" but I do mean to say that I am in favor of confining it within statutory and constitutional limitations and to not enthrone it above and superior to either. In other words, I am in favor of employing and applying the police power within its declared and settled limitations, but I am opposed to crowning it, in the realm of the law, as "Lord of all."

I therefore most respectfully dissent, and I am authorized to say that Judge Logan joins me in doing so.