**SUNBEAM CORPORATION,**
Plaintiff,

v.

**John W. RICHARDSON, Joe B. Richardson, John W. Richardson III, Charles Robert Richardson, Partners, d/b/a Richardson Hardware Company and Barren County Hardware Company, Defendants.**

**No. 532.**

United States District Court
W. D. Kentucky, Bowling Green.
July 15, 1956.

Carroll M. Redford, Glasgow, Ky., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., Thomas M. Scanlon and Raymond W. Gray, Jr., Indianapolis, Ind., Finn & Van Mell, Chicago, Ill., of counsel, for plaintiff.

Richard L. Garnett, Glasgow, Ky., R. M. Coleman, Bowling Green, Ky., for defendants.

SWINFORD, District Judge.

This is an action for injunctive relief under the Kentucky Fair Trade Act of 1936, KRS 365.080, 365.090. The Act provides as follows:

"365.080 (4748i–1; 4748i–3) Resale price of commodities may be regulated by contract; conditions implied. (1) No contract relating to the sale or resale of a commodity that bears, or the label or content of which bears, the trade-mark, brand or name of the producer or owner of the commodity and that is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this state by reason of any of the following provisions that may be contained in such contract:

"(a) That the buyer will not resell any such commodity except at the price stipulated by the vendor.

"(b) That the producer or vendee of a commodity will, upon the sale of such commodity to another, require the purchaser to agree that he will not, in turn, resell except at the price stipulated by the producer or vendee.

"(2) Provisions of the kind referred to in subsection (1) of this section in any contract shall be deemed to contain or imply conditions that the commodity may be resold without reference to the agreement in the following cases:

"(a) In closing out the owner's stock for the purpose of discontinuing delivery of any such commodity, if such stock is first offered to the manufacturer of the stock at the original invoice stock price, at least ten days before the stock is offered by sale to the public.

"(b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(c) By any officer acting under the orders of any court.

"(3) This section and KRS 365.-090 do not apply to any contract or agreement between producers, or between wholesalers or between retailers as to sale or resale prices.

"365.090 (4748i–2) Effect of sale of commodity at less than contract price. Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of KRS 365.080, whether the person so advertising, offering for sale or selling is or is not a party to the agreement, is unfair competition and is actionable at the suit of any person damaged thereby."

The plaintiff seeks to enjoin the defendants from selling the plaintiff's trademarked products at prices below the fair trade prices established for the various items, pursuant to the Act.

The plaintiff is an Illinois corporation and sells in interstate commerce in Kentucky various electric household appliances such as toasters, mixers, automatic cookers, percolators and grills. The defendants are citizens of Glasgow, Kentucky, and operate as a partnership, two small hardware stores. The total sales of the plaintiff's products in these two hardware stores during the past five years is estimated to have been less than $1,000.

The plaintiff is the owner of the trademark "Sunbeam" and other trademarks used in connection with that name. It has invested may hundreds of thousands of dollars, estimated by witnesses to be in excess of $30,000,000, in acquiring consumer and distributor good will in connection with the trademarks. Acting under the Kentucky Fair Trade Act the plaintiff has entered into more than four thousand contracts with retailers in the Commonwealth of Kentucky. It has entered into these retailer contracts with thirty retailers in Glasgow, Kentucky. The agreements fix minimum retail prices for the products sold in Kentucky.

The defendants have not executed a fair trade contract with the plaintiff or any one acting for it but have, with full knowledge of the existence of such contracts in Kentucky and the minimum prices established thereby, willfully advertised, offered for sale and sold the plaintiff's products at prices below the minimum prices established by the contracts with other retailers and threaten to continue to do so. The products sold by the defendants were not furnished to them by the plaintiff or any agent acting on its behalf. It is established by the proof that the plaintiff's property right in its trademarks and the good will incident thereto is in excess of the value of $3,000 in the Glasgow area alone.

By their answer and amended answer the defendants allege that the Kentucky Fair Trade Act is invalid and void. They contend that it violates the Supremacy Clause, art. 6, impairs the obligations of contracts, art. 1, § 10, and deprives them of their property without due process of law, Amend. 14, as guaranteed by the United States Constitution. They further assert that the Act interferes with their property rights and ownership in the items they have sold and propose to continue to sell; that it delegates legislative power and constitutes special and discriminatory legislation in violation of the Kentucky Constitution.

So much has been written in the opinions of the state and federal courts on the fair trade laws that I hesitate to burden this opinion with background. In the interest of clarity I will, however, refer briefly to that history.

It might be said that the first case dealing with judicial construction of modern price fixing contracts was the case of Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. Dr. Miles Medical Company was a corporation engaged in the manufacture and sale of proprietary medicines, prepared by means of secret methods and formulas and identified by distinctive packages, labels and trademarks. An extensive trade throughout the United States and in certain foreign countries had been established by the corporation. It sold its medicines to jobbers and wholesale druggists who in turn sold to retail druggists for sale to the ultimate consumer. In order to protect its trademark, good will and reputation, it sought to control, regulate and govern the sale and marketing of its products by contracts in writing which it required to be executed by all jobbers and wholesale druggists to whom it sold. The contracts set forth the prices to be charged for separate items.

The district court sustained a demurrer to the bill of complaint for want of equity. The Court of Appeals for the Sixth Circuit affirmed the judgment. The United States Supreme Court sustained the lower court and held that a system of contracts between manufacturers and wholesale and retail merchants by which the manufacturers attempt to control not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail whether purchasers or subpurchasers, and fixing the amount which the consumer shall pay, amounts to restraint of trade and is invalid at common law in so far as it affects interstate commerce under the Sherman Anti-Trust Act of July 2, 1890. 15 U.S.C.A. §§ 1-7.

The opinion by Mr. Justice Hughes stated that the manufacturer could not lawfully fix prices for future sales, even though the restrictions in such contracts were known to the purchaser; that whatever rights the manufacturer had in that respect must be by agreement.

It is because of this decision by the Supreme Court that the fair trade laws were enacted by the states. Their import was to authorize the fixing of resale price agreements and exempt them from state antitrust laws and to require that the established prices in such agreements were to be adhered to by all retailers selling the products with knowledge of the contract irrespective of whether such retailers were or were not signers of such agreements.

In order to free these contracts from the Sherman Anti-Trust Act, Congress

enacted the Miller-Tydings Act as an amendment to the Sherman Act, 50 Stat. 693, 15 U.S.C.A. § 1.

15 U.S.C.A. § 1 provides:

"That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title  *  *  * ."

It was obviously the intention of Congress that the Miller-Tydings Act should provide the same exemption from the federal antitrust laws as the state fair trade acts sought to provide with reference to the state antitrust laws in their respective states, but in my opinion only to the extent that signers of such agreements and not nonsigners were to be included. The Miller-Tydings Act contains no wording which can be construed to cover retailers, such as the defendants here, who did not sign the agreements to fix prices.

It was so held in 1951 by the United States Supreme Court in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035. In construing a fair trade statute of the State of Louisiana the Court said that the Miller-Tydings Act did not affect noncontracting competitors of contracting retailers.

On July 14, 1952, Congress passed the McGuire Act, 66 Stat. 632, 15 U.S.C.A. § 45(a) as an amendment to the Federal Trade Commission Act. It provided that nothing contained in the antitrust acts should render unlawful the fixing of prices by agreements or contracts and that the prices fixed by such agreements would apply to both signers and nonsigners.

Forty five states now have fair trade laws. The highest courts for seventeen states have approved them under their respective state constitutions. In five states the courts of last resort have held them to be unconstitutional. The constitutionality of the Fair Trade Law in Kentucky has not been passed upon by the Court of Appeals of this state.

The defendant challenges the jurisdiction of this court on the ground that the controversy does not involve the jurisdictional amount of $3,000 exclusive of interest and costs. This contention is based upon the fact as revealed by the record that the total sales of the plaintiff's products by the defendants for the five years preceding the filing of the action amounted to less than $3,000.

In cases of this character the jurisdictional amount is not to be determined by the amount of sales and the amount of money derived therefrom but is based upon the value of the right to be protected; that is, the value of the property right the plaintiff possesses in the good will of its products. Glenwood Light Co. v. Mutual Light Co., 239 U.S. 121, 36 S.Ct. 30, 60 L.Ed. 174; Old Dearborn Co. v. Seagram Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109.

In unfair trade practices cases it is not the immediate pecuniary damages arising from the wrongful acts that are alleged but the value of the business or the rights which the plaintiffs claim to be protected. Business reputation and good will are intangible assets and are to be taken into consideration in determining that value. Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co., 10 Cir., 95 F.2d 711.

It is established by the proof that the plaintiff has expended hundreds of

thousands of dollars advertising and promoting its trade-marks and that its retailers in Kentucky alone number approximately 7,200. It is claimed by the plaintiff that if the defendants' price cutting practices are not enjoined that it will result in a loss of retail outlets to the plaintiff which will result in damages to the plaintiff's good will in an amount far in excess of $3,000. The jurisdictional amount is established by the record.

The plaintiff relies upon the case of Old Dearborn Co. v. Seagram Corp., supra. This case was decided in 1936. Since it was prior to the enactment of the Miller-Tydings Act and the McGuire Act it must be considered as having treated the legislation involved (an Illinois fair trade statute similar to the Kentucky law with which we are concerned) solely on the question of its constitutionality in the light of the Fifth and Fourteenth Amendments to the United States Constitution. The Court held that the act was valid but it limited its holding to the fixing of prices by a contract between the parties. The Court ruled that there was nothing in the act that was an unlawful delegation of power to private persons to control the disposition of the property of others which it had condemned in Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156, and Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 873, 80 L.Ed. 1160.

In the Carter case Mr. Justice Sutherland, who wrote the opinion in the Old Dearborn case, in holding the Bituminous Coal Conservation Act of 1935 unconstitutional said: "The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." This same Justice in Old Dearborn points out in that case that the property affected had been acquired without any pre-existing restriction in respect to its use or disposition.

I point these things out for the purpose of emphasizing that in Old Dearborn the Court was not concerned with anything other than the right of the parties to contract on price fixing. It had no intention of passing upon the constitutionality of an act, such as the one in the case at bar, where nonsigners of contracts were bound against their will.

This conclusion is amply justified by the decision of the same Court in Schwegmann Bros. v. Calvert Corp., supra. That decision upheld the validity of the Miller-Tydings Act but expressly limited it in its application to signers of contracts and agreements fixing prices and excluded the nonsigners. It said that what was granted was a limited immunity; that is, a limitation that is emphasized by the inclusion in the state law and the exclusion in the federal law of the nonsigner provision. In my judgment Schwegmann Bros. v. Calvert Corp., supra, is controlling in the decision of the case at bar and the plaintiff is not entitled to injunctive relief unless, by the provisions of the McGuire Act, life has been put into the Kentucky Fair Trade Statute of 1936.

Article VI of the Constitution of the United States provides that the laws of the United States made in pursuance of the Constitution shall be the supreme law of the land; and that judges in every state shall be bound thereby, the laws of any state to the contrary notwithstanding.

This Supremacy Clause, making the constitutional laws of the United States the supreme law of the land, cannot be ignored. Whatever the economic philosophy might have been in 1936, it had not been expressed, as regards the instant question, by legislative enactment. Had the Fair Trade Act of Kentucky been attacked before the enactment of the Miller-Tydings Act of 1937, it would have been declared invalid. See Schwegmann Bros. v. Calvert Corp., supra. In that case the Supreme Court said [341 U.S. 384, 71 S.Ct. 746]:

"It is clear from our decisions under the Sherman Act, 26 Stat. 209, 15 U.S.C.A. §§ 1–7, 15 note, that this interstate marketing arrangement would be illegal, that it would be enjoined, that it would draw civil and criminal penalties, and that no court would enforce it. Fixing minimum prices, like other types of price fixing, is illegal per se. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259 [95 L.Ed. 219]. Resale price maintenance was indeed struck down in Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress."

The Miller-Tydings Amendment excepted from the Sherman Law contracts or agreements prescribing minimum prices for the resale of trademarked commodities where such contracts were valid under the statute or policy of the state.

This amendment, explained by Senator Tydings, its author, is intended to permit a man who manufactures an article to state the minimum resale price of the article in a contract with a man who buys it for ultimate resale to the public. It is clear from the fact that the Miller-Tydings Amendment was passed that the Congress of the United States recognized that legislation such as the Kentucky Fair Trade law was invalid without an enabling act of the national Congress and for that reason saw fit to pass the Miller-Tydings Amendment to the Sherman Law.

The plaintiff in the case at bar acknowledges that the state fair trade laws require enabling legislation from the national Congress. It contends, however, that the inherent right to such law was within the state in the exercise of its police power and that the Miller-Tydings amendment gave the law already enacted by the state legislature the life it needed to become effective and therefore the Supremacy Clause of the federal Constitution does not apply.

■■ There is such an admixture of economics and legal pronouncements in the authorities that the question is not without some confusion in the argument presented. If the question of minimum price fixing on fair trade articles was subject to legislation under the police power of the state, there would have been no necessity for a congressional enabling enactment. The State of Kentucky may exercise its police power without permission from the federal government. It must be recognized that such right was not inherently in the State of Kentucky under its police power. The matter, in my judgment, was not one subject to the exercise of the police power of the state. It does not pretend to be for the protection of the whole people of Kentucky but only for the protection of owners and claimers of certain trade-marks and the good will which such trade-marks carry for the benefit of wholesalers and retailers for items which are not necessities but luxuries.

■ Courts have gone far, including the court of last resort in Kentucky, in sustaining the police power of the state and in permitting it to regulate various things which at the time appeared to be necessary for the best interests of all the people. The right is not absolute and is subject always to restraint or abridgment as the public welfare demands. Mansbach Scrap Iron Co. v. City of Ashland, 235 Ky. 265, 30 S.W.2d 968.

■ An act of the legislature in the name of the police power of the state to regulate business of any kind cannot be permitted to suspend the Bill of Rights which guarantees as inherent and inalienable the right of acquiring and protecting property and the right to engage in any business or occupation and make contracts in reference thereto. "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the larg-

est majority." Ky.Const. Secs. 1 and 2; Kenton, & Campbell Benevolent Burial Ass'n v. Goodpaster, 304 Ky. 233, 200 S.W.2d 120.

In the case of Reeves v. Simons, 289 Ky. 793, 160 S.W.2d 149; which was a case dealing with a price fixing statute known as the Distilled Spirits and Wine Fair Trade Act and applied only to intoxicating liquors, the Court of Appeals of Kentucky recognized that the Legislature under the police power may fix minimum prices on the sale of commodities, whether or not affected with a public interest, and cited in support of its conclusion, among other cases, Nebbia v. People of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940. The Kentucky court, however, hastened to add that its opinion, based solely upon the fact that the statute under attack, related only to the regulation of the sale of liquor and expressly refrained from passing its opinion upon the right of the Legislature to fix minimum prices on all commodities.

It is fundamental that a statute adopted in the exercise of the state police power must be primarily for that avowed and intended purpose. It has been judicially determined that the fair trade statutes, such as the one in question, are more in the nature of patent rights or copyright protection and are for the benefit of the manufacturer and not for the benefit of the whole people of the state. In Old Dearborn Co. v. Seagram Corp., supra [299 U.S. 183, 57 S.Ct. 144], the Supreme Court, speaking through Mr. Justice Sutherland, said: "The primary aim of the law is to protect the property—namely, the good will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself."

Even though it may be conceded that the Miller-Tydings Act and the McGuire Act, necessary federal enabling legislation, gave the force of law to the Kentucky statute, hitherto invalid, the nonsigner provision of the Kentucky statute must depend upon the validity of the nonsigner provision of the McGuire Act. If the nonsigner provision of the McGuire Act is unconstitutional, as contrary to the Fifth and Fourteenth Amendments of the United States Constitution, then the Kentucky Act must fall, irrespective of the Supremacy Clause.

While the Supreme Court has upheld the Miller-Tydings Act it has not passed directly upon the nonsigner provision of the McGuire Act. Old Dearborn and Schwegmann Bros. v. Calvert Corp., supra, may have overruled or modified former decisions of the Court on the matter of price fixing as to contracting parties, but did not overrule or modify decisions as to noncontracting parties. Thus, in determining the validity of the nonsigner provision of the McGuire Act, this court is faced with the decisions of the Supreme Court which have expressly declared invalid such legislative enactments. Dr. Miles Medical Co. v. Park & Sons Co., supra; U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; and Schechter Poultry Corp. v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570.

While the Supreme Court has handed down no decision on this provision in the McGuire Act, it strongly suggests that such a provision would be declared invalid if trial courts are to follow the language in Schwegmann Bros. v. Calvert Corp., supra [341 U.S. 384, 71 S.Ct. 747]. The Court said:

"If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by

compulsion. That is not following the path of consensual agreement; that is resort to coercion."

At another place in the opinion the Court said:

"Therefore, when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids. See Parker v. Brown, 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315. Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual 'vertical' agreements with all his retailers. But when retailers are *forced* to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to *voluntary* engagements."

On June 11, 1956, the Supreme Court handed down a decision in the case of U. S. v. McKesson & Robbins, 351 U.S. 305, 76 S.Ct. 937, 940. The Court quoted with approval the following language from U. S. v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024:

" 'A distributor of a trade-marked article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may resell, except as the seller moves along the route which is marked by the Miller-Tydings Act.' "

In a footnote to the opinion in the case of Sunbeam Corporation v. Masters of Miami, 5 Cir., 225 F.2d 191, there is set forth the Report of the Attorney General's National Committee to Study the Antitrust Laws, which was published on March 31, 1955, and is opposed to resale-price maintenance. The court comments that the report appears to be a very careful study of the economic as well as the legal considerations of such legislation and that the Committee's conclusions may well be influential in the courts as well as Congress.

The Report recommends that Congress repeal both the Miller-Tydings amendment to the Sherman Act and the McGuire amendment to the Federal Trade Commission Act and says: " * * * thereby subjecting resale-price maintenance, as other price-fixing practices, to those Federal antitrust controls which safeguard the public by keeping the channels of distribution free."

■ A monopoly is a monopoly whether achieved by unlawful merger or by special legislation. The courts alone have the responsibility of protecting the public from legislation that ignores fundamental law.

■ To delegate the authority to fix prices on goods of nonsigners with no standard or qualification, except the arbitrary judgment or whim of the manufacturer, is a complete departure from legal standards required by constitutional provisions. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Schechter Corporation v. U. S., supra.

This legislation must ultimately result in monopoly by making the vendor and vendee of a commodity the absolute arbiters of the property rights of strangers to the contract who own goods of the same brand. To stifle trade in any commodity fosters monopoly. Sunbeam Corp. v. Wentling, 3 Cir., 192 F.2d 7.

The evil of this legislation is apparent in the arguments advanced to sustain it. It is strenuously urged that the court must recognize that the retailer has only an ownership in the article but does not own the trade mark or good will. This separation of estate in a chattel as to ownership is pronounced in the Old Dearborn case, recognized by many authorities cited by the plaintiff. This court must, of course, respect the authority which makes such pronouncement as law. Its application should be had, however, only in cases peculiarly adapted to such reasoning.

Circumstances in the present case suggest a reexamination of what appears to

be a pure legal fiction in the light of present day economics. The rule, it seems, provides that a retail dealer pays his money for an item but the purchase price gives him only a limited estate. Common sense would seem to entitle him to all property rights. It may be reasonably assumed that the price he paid was established because the article bore a certain label or trade mark. Had it not been for the label he would not have been required to pay such a price. The label caused him to buy and the label assists him in selling. The value of the item is thus enhanced by reason of the label indicating that it is an established and nationally advertised commodity. If the label were removed the price to him would be reduced proportionately. What that proportion would be is entirely speculative although it may be assumed that formulas are set up in the accountancy system used to determine wholesale, jobber and retail prices. Since the price he has paid was established, taking all of these matters into consideration, it would seem that he should own the item outright and be able to dispose of it without first having to obtain permission from the person from whom it was purchased.

To use an illustration, we may say a man buys a Buick automobile. He pays more for it because it bears the label "Buick", an established nationally and internationally known piece of machinery. He sells the car for a greater price because it bears the label "Buick". How can his ownership be separated into two parts? If it were made by Buick but did not carry with it a labeled evidence of that fact, it would not have cost him so much nor could he have sold it for so much.

It is stated and repeated in many opinions that legislation and litigation involving price fixing statutes have had an eventful and, I might add, checkered history in this country. One court has stated succinctly that the controversy points to basic differences in economic philosophies between the segment of our system which believes in free competition and those who believe that products sold under the name of the manufacturer should be eliminated from competition insofar as that competition relates to resale prices. Eli Lilly & Co. v. Schwegmann Bros. Giant Super Markets, D.C., 109 F.Supp. 269.

Philosophies of economics should have no place in judicial determination. Theories of economic policy do and should change with changing conditions. Those changes, as needed should be reflected in legislative enactment and not in court opinions. The court here is concerned only with the power of the Legislature of Kentucky to enact the Fair Trade Statute in 1936. The wisdom of the economic policy is not to be considered. Old Dearborn Co. v. Seagram Corp., supra; Moore v. Northern Ky. Ind. Food Dealers Ass'n, 286 Ky. 24, 149 S.W.2d 755. The function of the court is not to uphold the act of the legislature but to determine the right of the legislature within constitutional limits to enact this statute.

The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law. The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law. Legislation which imposes limited ownership in personal property and restricts the use or sale of that property, in the absence of contract with the owner, is a deprivation of the property without due process of law under recognized interpretation of these sections by the courts.

In my opinion neither the McGuire Act nor the Fair Trade Statute of Kentucky is a lawful exercise of the police power. The portion of the McGuire Act which seeks to impose fixed prices upon nonsigners of contracts contravenes these constitutional provisions and is invalid. Without such provision in the federal law the Kentucky legislation falls.

Section 3 of the Constitution of Kentucky provides that no grant of exclusive,

special public emoluments or privileges shall be made to any man or set of men. Section 19 prohibits the enactment of any law impairing the obligation of contracts. The legislation under consideration is repugnant to the provisions of both the federal and state constitutions. It is not a proper exercise of the police power and is therefore invalid. The manufacturer may not project his control, in the absence of contract, beyond his own sales. He has no inherent power incident to production and original ownership. Having sold his products at prices satisfactory to himself, the public is entitled to whatever advantage there may be from competition in the subsequent offering for sale of the products. Dr. Miles Medical Co. v. Park & Sons Co., supra.

The complaint should be dismissed at the cost of the plaintiff.

Findings of fact and conclusions of law in conformity with this opinion are this day entered.