YOUNGS RUBBER CORPORATION,
a body corporate

v.

DART DRUG CORPORATION OF
MARYLAND, a body corporate.

Civ. A. No. 10500.

United States District Court
D. Maryland.

July 14, 1959.

Bernard S. Melnicove, Needle & Melnicove, Baltimore, Md., for plaintiff.

Harry Silbert, Baltimore, Md., and J. E. Bindeman, Washington, D. C., for defendant.

R. DORSEY WATKINS, District Judge.

This is a typical action for an injunction to restrain alleged violations of the Maryland Fair Trade Act, Maryland Code of Public General Laws, 1957 Edition, Article 83, sections 102–110. As a result of a pretrial conference, stipulations, and uncontested testimony, there are no real issues of fact, the questions being substantially reduced to the legal effect of such facts, which are found as such by the court as hereinafter stated in this opinion.

Plaintiff is engaged in the manufacture, sale and distribution,[1] of commodities of venereal prophylaxis known as "Trojans", and is the owner of the trademarks, names and brands associated therewith. Defendant operates a retail drug store in Silver Spring, Maryland, selling and offering for sale the usual articles of such operation, including commodities of venereal prophylaxis, and specifically such products manufactured by plaintiff and bearing plaintiff's name and trade-mark.

Defendant admits that before the institution of this suit it sold plaintiff's products at prices less than the fair-trade prices if such fair-trade prices were in fact legal.

The name "Trojans" was registered by plaintiff as a trade-mark in the United States Patent Office on April 29, 1947, and plaintiff since then at all times has been the owner thereof. Such products bearing the trade-mark have been widely distributed and sold throughout the United States.

Since 1936, plaintiff has stipulated and established minimum prices for the sale at retail in the State of Maryland, pursuant to the Maryland Fair Trade Act, of its commodities. Plaintiff has in Maryland entered into written agreements covering the sale of "Trojans" by retailers to consumers pursuant to the Maryland Fair Trade Act. They include the following stipulations, which at all times in question were in full force and effect:

"4. (a) The offering or giving of any article of value in connection with the sale by Retailer of any of the Commodities; (b) the offering or making of any concession of any kind whatsoever (whether by the giving of coupons, trading stamps or otherwise) in connection with any such sale, or (c) the sale or offering for sale of any of the Commodities by Retailer in combination with any other merchandise shall constitute a breach by Retailer of Article 1 of this agreement.

"5. Manufacturer in good faith will employ all appropriate means, which in the circumstances shall be reasonable, including legal proceedings if such other means fail, to prevent, and to enforce the discontinuance of, any violation of said minimum retail price stipulations by any competitor of Retailer, whether the person violating or threatening such violation is or is not a party to a Fair Trade Contract with Manufacturer covering said Commodities."

Defendant was, before the occurrence of the alleged violations out of which this suit arose, informed of the existence of such contracts, and of the specified minimum retail prices of plaintiff's commodities then in effect in Maryland.

Defendant, with such knowledge, sold and offered for sale plaintiff's products, at prices below the minimum retail prices stipulated in plaintiff's written Maryland contracts then in force.

Defendant admitted, and there was proved, the requisite diversity of citizenship. Defendant however contested the existence of the requisite jurisdictional amount [2] in controversy; defendant also denied that plaintiff's products were in free and open competition with commodities of the same class produced and distributed by others; and defendant further contended that plaintiff was barred by "unclean hands" in that plaintiff had failed diligently to enforce its Maryland fair-trade agreements and had abandoned its fair-trade program through permitting its fair-traded items to be sold with trading stamps.

Plaintiff called as witnesses its own employees, and also independent Mary-

---

1. Plaintiff sells through wholesalers who sell only to retail drug stores dispensing through registered pharmacists. No sales of plaintiff's products are made through coin machines, or knowingly made through chain stores or other merchandising outlets or devices not under the control and supervision of a registered pharmacist.

2. $3,000 at the time of the filing of the complaint.

land pharmacists. Their testimony establishes to the court's satisfaction that plaintiff sells only through wholesalers who in turn sell to retail druggists, and that sales by plaintiff to Maryland wholesalers exceed $50,000 per year.[3]

Plaintiff advertises its products in all the recognized professional pharmaceutical journals, including the "Maryland Pharmacist". Such products are in competition with products of at least four other companies all of which products are designed to accomplish the same results.

One of plaintiff's witnesses testified, without objection, that plaintiff's trademark "Trojans" was worth $10,000,000. There was also testimony, satisfactory to the court, that plaintiff acted on the policy that price cutting was regarded by the public as indicating an inferior product, and that fair-trade violations would produce sale difficulties.

There was also competent testimony by employees of plaintiff and by independent pharmacists, which the court accepts, that purchasers of venereal prophylactics often request them by name or brand [4]; that the price of plaintiff's products is known by the customers [5]; and that if the prospective purchaser asks simply for the desideratum, without specifying the brand, a Trojan would be offered, because of drug store satisfaction with plaintiff's policies, including enforcement and sales program.

The evidence offered showed the most vigorous enforcement of fair-trade policy that has come before this court or of which it is familiar through the decided cases or law review articles. Plaintiff's general counsel testified that it was plaintiff's policy to solicit a fair-trade contract from every drug store; that his company was the first to invoke judicial sanctions in the United States; that many years ago he had received a complaint of a fair-trade violation in Westminster, Maryland, which after investigation and conferences was terminated; that the present complaint was the only known violation in Maryland prior to the filing of this suit; and that after the filing of the complaint herein, when a shopping indicated another violation, he sent a notice demanding the cessation of violations, and they stopped. He further testified to a general routine under which every complaint is investigated; the violator is sought to be "sold" on the merits of fair-trade; if this is unsuccessful, a formal notice of violation is sent; and if the notice is not heeded, a suit is filed.

Plaintiff's District Sales Manager for five states, including Maryland, testified that except for defendant, he had found no violations in Maryland of plaintiff's fair-trade contracts in the past five years. He regularly shopped in Maryland about ten times a year, shopping five to ten stores a day in the area he covered with his salesmen.[6] On cross-examination he was confronted with affidavits by employees of defendant that a co-operative in the general area of defendant gave coupons [7] with the sale of plaintiff's products. He replied that he had learned of such alleged violation only on the Thursday preceding trial, through

3. This figure relates to Maryland wholesalers; in addition, sales to Maryland retailers are made in Maryland by wholesalers in adjoining states and the District of Columbia.

4. One independent pharmacist testified that most—70 to 80%—asked by brand name, usually Trojans; another, a member of the Maryland Board of Pharmacists, testified that a majority asked for a particular brand, and of those who did, 60% requested Trojans.

5. The price is shown on most of the containers of plaintiff's products, although it is not stated as the fair-trade price. One of the independent pharmacists stated on cross-examination that it was "amazing", but most customers knew the price of plaintiff's articles, and usually would have the correct change ready.

6. He would ask for a prophylactic without specifying the name.

7. These purport to entitle a purchaser to a year-end cash distribution of, and proportionate to, the *net* profit of the co-operative.

defendant's attorney; that the next morning he went to see the co-operative's comptroller who stated that the co-operative showed no profit thus far in 1959; but that nevertheless he (plaintiff's sales manager) had advised the co-operative's comptroller that Trojans had to be taken off the co-operative arrangement, or they could not be sold.

Defendant's defense that plaintiff had permitted its products to be sold at the minimum fair-trade prices with trading stamps [8] was not substantiated.

The court also finds that plaintiff's goods were in free and open competition with commodities of the same class produced and distributed by others. Eastman Kodak Company v. Home Utilities Company, D.C.D.Md.1956, 138 F.Supp. 670, 674–677; affirmed on this point, 4 Cir., 1956, 234 F.2d 766, 770–771, certiorari granted 1956, 352 U.S. 821, 77 S.Ct. 62, 1 L.Ed.2d 46, dismissed 1957, 352 U.S. 956, 77 S.Ct. 349, 1 L.Ed.2d 363.

■ The primary aim of the Maryland Fair Trade Act is "to protect the property—namely, the good will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself." Schill v. Remington Putman Book Co., 1941, 179 Md. 83, 89, 17 A.2d 175, 178, 22 A.2d 128, quoting from Old Dearborn Distributing Co. v. Seagram-Distillers Corp.,

1936, 299 U.S. 183, 193, 57 S.Ct. 139, 81 L.Ed. 109.

■■ Whether the approach be that defendant's conduct unless enjoined, would directly and through its effect on others, in the indefinite future eventually impair the value of the right sought to be protected in an amount in excess of the jurisdictional amount, Lee-Wilson, Inc. v. General Electric Company, 1 Cir., 1955, 222 F.2d 850, 852; [9] or that the right to be protected is the value of the good will, represented in part by, or associated with the registered trade-mark, Calvert Distilling Co. v. Brandon, D.C. S.C.1938, 24 F.Supp. 857; James Heddon's Sons v. Callender, D.C.Minn.1939, 28 F.Supp. 643, 644, 645; Miles Laboratories v. Seignious, D.C.S.C.1939, 30 F. Supp. 549, 554; Caron Corp. v. Wolf Drug Co., D.C.N.J.1941, 40 F.Supp. 103, 104; Calvert Distillers Corp. v. Rosen, D.C.Ill.1953, 115 F.Supp. 146, 147; Sunbeam Corp. v. Richardson, D.C.Ky.1956, 144 F.Supp. 583, 587 reversed on other grounds, 6 Cir., 1957, 243 F.2d 501; see also Sunbeam Corp. v. MacMillan, D.C. Md.1953, 110 F.Supp. 836, 837; Sunbeam Corp. v. Golden Rule Appliance Co., 2 Cir., 1958, 252 F.2d 467, 470, the court finds that under the facts in this case the necessary jurisdictional amount exists and is in controversy.[10]

Plaintiff is entitled to the injunction as prayed.

8. Whether a sale at an established cash fair-trade minimum price, but with trading stamps, is a violation of the Maryland Fair Trade Act, therefore need not be considered.

9. See also National Ass'n for Advancement of Colored People v. Patty, D.C. Va.1958, 159 F.Supp. 503, 519–521, judgment vacated and case remanded on other grounds Harrison v. N. A. A. C. P., 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed. 2d 1152, holding that where continuing harmful effect (in that case, of a regulatory statute) is alleged, "the jurisdiction of the court is to be tested by the value of the object to be gained. Failure to prove that a sufficient amount of damage has already been sustained will not defeat the remedy if the injury is

recurrent or continuous * * *" 159 F. Supp. at page 520.

10. The 2–1 decision in Seagram-Distillers Corp. v. New Cut Rate Liquors, 7 Cir., 1957, 245 F.2d 453, 458, certiorari denied 1957, 355 U.S. 837, 78 S.Ct. 61, 2 L.Ed.2d 48, containing language to the effect that actual pecuniary loss must be proved, may be explained on the fact that plaintiff alleged it could prove an actual damage in excess of the jurisdictional amount, and started to offer evidence of such loss, but did not do so, particularly in view of Snap-On Tools Corporation v. Winkenweder & Ladd, Inc., 7 Cir., 1957, 250 F.2d 154, where the value of the trade-mark was considered to be the amount in controversy. If the Seagram case is not so distinguishable, this court declines to follow it.